COLLEEN BAL, SBN 167637
JOHN P. FLYNN, SBN 141094
JEFF VANHOOREWEGHE, SBN 313371
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: cbal@wsgr.com
        jflynn@wsgr.com
        jvanhooreweghe@wsgr.com

KENNETH R. O'ROURKE, SBN 120144
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street, NW
Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email: korourke@wsgr.com

*Attorneys for Plaintiffs Seagate Technology LLC,*
*Seagate Technology (Thailand) Ltd., Seagate*
*Singapore International Headquarters Pte. Ltd.,*
*and Seagate Technology International*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAGATE TECHNOLOGY LLC, SEAGATE TECHNOLOGY (THAILAND) LTD., SEAGATE SINGAPORE INTERNATIONAL HEADQUARTERS PTE. LTD., and SEAGATE TECHNOLOGY INTERNATIONAL,<br><br>            Plaintiffs,<br><br>      v.<br><br>HEADWAY TECHNOLOGIES, INC., HUTCHINSON TECHNOLOGY INC., MAGNECOMP PRECISION TECHNOLOGY PUBLIC CO. LTD., NAT PERIPHERAL (DONG GUAN) CO., LTD., NAT PERIPHERAL (H.K.) CO., LTD., NHK SPRING CO. LTD., NHK INTERNATIONAL CORPORATION, NHK SPRING (THAILAND) CO., LTD., NHK SPRING PRECISION (GUANGZHOU) CO., LTD., SAE MAGNETICS (H.K.) LTD., and TDK CORPORATION,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

1.     This antitrust and breach of contract action seeks to redress a longstanding conspiracy by the leading manufacturers of essential computer technology components called suspension assemblies.  Suspension assemblies are an indispensable component of computer hard disk drives (HDDs).  The conspirators fixed, raised and stabilized prices of suspension assemblies and allocated supply shares of these products with an overriding purpose of selling for higher prices and making more money than they otherwise would have if there had been robust competition.  The conspirators implemented the price fixing and market allocation conspiracy by *inter alia* exchanging confidential information in breach of agreements that prohibited the disclosure of such information.

2.     Plaintiff Seagate Technology LLC ("Seagate LLC"), with Seagate Technology (Thailand) Ltd. ("Seagate Thailand"), Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore"), and Seagate Technology International ("Seagate International"), (collectively, "Seagate" or "Plaintiffs") purchased billions of dollars worth of suspension assemblies for use in making hard drives, which in turn are found in computers everywhere that serve as important technologies for major U.S. industries, key health and safety sectors, small businesses, and ordinary households.

3.     Plaintiffs bring this action for damages under the antitrust laws of the United States and various states, as well as for breach of contract, against three Defendant groups:

(i)   NHK Defendants:  NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NHK Spring Precision (Guangzhou) Co., Ltd. (collectively, "NHK");

(ii)  TDK Defendants:   Headway Technologies, Inc., Magnecomp Precision Technology Public Co., Ltd., SAE Magnetics (H.K.) Ltd., and TDK Corporation (collectively, "TDK"), and

(iii) HTI Defendant:  Hutchinson Technology Inc. ("HTI").

4.     Notably, TDK acquired HTI in 2016, and many of the events alleged herein took place prior to 2016 when HTI operated as a separate legal entity.  Accordingly, references to "TDK" also include HTI, except where HTI is referenced individually.

COMPLAINT FOR DAMAGES                    -1-

5.     Plaintiffs allege as follows on personal knowledge as to themselves and upon information and belief as to all others:

## I.     INTRODUCTION

6.     Defendants and their co-conspirators knowingly conspired for more than 12 years not to compete in the supply of suspension assemblies.  Specifically, Defendants agreed to fix the prices and market shares of suspension assemblies sold to Seagate from as early as 2003 through at least April 2016 (the "Conspiracy Period").  As a result, Seagate paid artificially high prices on billions of dollars of its purchases of suspension assemblies.

7.     At least five antitrust agencies around the world have investigated or continue to investigate aspects of this conspiracy.  The antitrust agencies known to have investigations include the United States Department of Justice ("DOJ"), the Japanese Fair Trade Commission ("JFTC"), the Administrative Council for Economic Defense in Brazil ("CADE"), the Taiwan Fair Trade Commission ("TFTC"), and the Competition and Consumer Commission of Singapore ("CCCS"). On information and belief, these antitrust agencies initiated these investigations because TDK filed for leniency with each of them and *admitted* to the conspiracy.

8.     Indeed, a February 2018 JFTC order (*see infra* ¶ 75) confirmed that TDK applied for leniency on May 6, 2016 under Articles 1(1) and 6-2 of the Rules on Reporting and the Submission of Supporting Materials in Relation to Immunity from or Reduction of Surcharges (Fair Trade Commission Rule No. 7 of 2005), a condition of which is to (i) be "among the enterprises who committed the relevant violation" and (ii) "submit reports and materials regarding the facts of the violation."[1]

9.     Similarly, it is a requirement in the DOJ Leniency Program[2] and the leniency program of Brazil[3] to admit to an antitrust violation.

---

[1] See Act Concerning Prohibition of Private Monopolization and Maintenance of Fair Trade, Act No. 54 of 1947 [Anti-Monopoly Act], 7-2(10)(i), available at https://www.jftc.go.jp/en/policy_enforcement/cartels_bidriggings/anti_cartel_files/The_Antimonopoly_Act.pdf.
[2] See Corporate Leniency Policy, available at https://www.justice.gov/atr/file/810281/download (requires the leniency application to make a "confession of wrongdoing").
[3] See CADE'S Antitrust Leniency Program Guidelines, available at http://en.cade.gov.br/topics/publications/guidelines/guidelines-cades-antitrust-leniency-program-final.pdf (requires the leniency application to "confess the wrongdoing").

10. Moreover, those agencies that have reported the results of their investigations have all found evidence of a conspiracy among the suppliers of suspension assemblies. For example, on July 29, 2019, the DOJ filed an Information against NHK for entering into a conspiracy to eliminate competition for HDD suspension assemblies.

11. On the same day, July 29, 2019, the DOJ announced that NHK entered into a criminal guilty plea agreement with it (dated July 26, 2019) whereby NHK *admitted* to participating in a conspiracy and to violating the Sherman Act within the United States. NHK agreed to pay a fine of $28.5 million.

12. On February 9, 2018, the JFTC issued a cease and desist order to TDK (which by that time had completed its acquisition of HTI) and NHK for engaging in conspiratorial conduct, and imposed a fine against NHK for approximately $9.9 million.

13. In April 2018, CADE issued a Technical Report concluding that there was "compelling evidence" that *all three suppliers*—TDK, NHK and HTI—participated in a price-fixing and market division conspiracy.

14. And just last week, on February 13, 2020, DOJ filed an indictment in the United States District Court for the Northern Disctrict of California charging two former NHK executives with price-fixing and market allocation in the sale and pricing of HDD suspension assemblies.

15. All three suppliers—NHK,TDK and HTI—have therefore *already been found to have conspired* to fix the prices of suspension assemblies and/or *have admitted* to doing so. Their conspiracy unjustifiably raised the price of these indispensable components of HDDs.

16. After announcing the NHK guilty plea, DOJ sent a letter to Seagate on September 4, 2019, notifying Seagate that it is a potential victim of the conspiracy because it or affiliated entities "may have purchased HDD suspension assemblies that were subject to price-fixing from NHK and/or its coconspirators."

17. During the Conspiracy Period, Defendants sold HDD suspension assemblies to Seagate within United States domestic and import trade and commerce at artificially inflated prices, as well as outside of the United States in a manner that directly and foreseeably caused harm to Seagate in the United States. Defendants did this with full knowledge that HDDs containing these

1   suspension assemblies would be present in the United States.  As a direct consequence, Seagate

2   suffered significant injury arising out of the conspiracy's impact on the United States.

3       18.    Defendants deceived Seagate and others in order to conceal their conspiracy

4   throughout the Conspiracy Period.  Indeed, the conspiracy was inherently self-concealing, and

5   Defendants also took affirmative steps to avoid detection of their conspiratorial conduct.  By way

6   of example, Defendants falsely represented that the pricing offered to Seagate was due to cost

7   increases or demand changes, deceiving Seagate into believing there were legitimate market reasons

8   for the prices it paid.  In reality, Defendants were cheating Seagate on billions of dollars of Seagate's

9   purchases by overcharging artificially inflated prices and allocating market shares.

10      19.    Defendants also misused confidential business and technical information that they

11  obtained from Seagate.  This information was provided under nondisclosure agreements for the

12  limited purpose of enabling Defendants to submit bids and proposals to Seagate.   Defendants

13  instead impermissibly shared the information with one another and improperly used it to further the

14  conspiracy.

15      20.    As the Assistant Attorney General of the DOJ, Makan Delrahim, emphasized when

16  announcing the recent guilty plea by Defendant NHK:  "While these parts are physically small, they

17  are critical to the operation and performance of electronic devices, and their impact on American

18  consumers and businesses is direct and substantial."

19      21.    Seagate brings this action to recover the overcharges it paid for HDD suspension

20  assemblies during the Conspiracy Period, as well as to obtain all additional relief permitted by law.

21  **II.     JURISDICTION**

22      22.    Seagate brings this action to recover damages, including treble damages under

23  Section 4 of the Clayton Act (15 U.S.C. § 15(a)), costs of suit and reasonable attorneys' fees arising

24  from Defendants' price-fixing and market allocation in violation of Section 1 of the Sherman Act

25  (15 U.S.C. § 1) as well as the state-law provisions identified below.

26      23.    This Court has subject matter jurisdiction over this action pursuant to Section 4 of

27  the Clayton Act (15 U.S.C. § 15(a)) and 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental

28  subject matter jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

24.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  This effect gives rise to Seagate's antitrust claims.  During the Conspiracy Period, the conspiracy directly and substantially affected the prices of HDD suspension assemblies purchased by Seagate and others in the United States and around the world.

25.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22).  In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States as they entered into contracts in the United States for the sale of HDD suspension assemblies, manufactured HDD suspension assemblies for sale in the United States and for incorporation into products for sale in the United States, and their conspiratorial conduct had a substantial effect on interstate and foreign trade and commerce in the United States.

**III.     VENUE**

26.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Seagate's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.  Venue is also proper in this District pursuant to mandatory venue clauses contained in nondisclosure agreements between Seagate and each of the Defendants.

27.     On October 8, 2019, the Judicial Panel on Multidistrict Litigation ("JPML") centralized several related actions pertaining to the conspiracy alleged herein in this District before the Honorable Maxine M. Chesney, Senior U.S. District Judge, as *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, MDL. No. 2918.  The JPML recognized that Defendant Headway Technologies, Inc. ("Headway") has its headquarters in this District and that third-party discovery is expected to take place from two HDD manufacturers headquartered in this District.  This case is related to the actions in MDL No. 2918.

1    28.    Intradistrict Assignment.  This action should be excluded from the Intradistrict

2    Assignment rules as detailed in N.D. Cal. L.R. 5-2(c) because it is related to MDL No. 2918, which

3    is an antitrust class action.

4    **IV.    PARTIES**

5         **a.    Seagate Plaintiffs**

6    29.    Plaintiff Seagate Technology LLC, a Delaware limited liability company, is a wholly

7    owned indirect subsidiary of Seagate Technology plc, with its principal place of business at 10200

8    South De Anza Boulevard, Cupertino, California 95014.  During the Conspiracy Period, Seagate

9    Technology LLC had primary responsibility for negotiating all of Seagate's purchases of suspension

10   assemblies during the relevant period and entered into agreements with the Defendants governing

11   these purchases, in addition to purchasing affected HDD suspension assemblies directly from

12   Defendants at prices illegally fixed by Defendants.  Seagate Technology LLC was thus injured in

13   its business or property as a result of Defendants' anticompetitive and unlawful conduct.

14   30.    Plaintiff Seagate Technology (Thailand) Ltd., a Thai corporation, is a wholly owned

15   indirect subsidiary of Seagate Technology plc, with its executive office at 10200 South De Anza

16   Boulevard, Cupertino, California 95014, and its registered office and primary operational activities

17   at 1627 Moo 7 Teparuk Road, Tambol Teparuk, Amphur Muang, Samutprakarn 10270, Thailand.

18   During the Conspiracy Period, Seagate Thailand assisted Seagate Technology LLC at times with

19   Seagate's purchase of the affected HDD suspension assemblies directly from certain Defendants at

20   prices illegally fixed by Defendants, and was thus injured in its business or property as a result of

21   Defendants' anticompetitive and unlawful conduct.

22   31.    Plaintiff Seagate Singapore International Headquarters Pte. Ltd., a Singapore

23   company, is a wholly owned indirect subsidiary of Seagate Technology plc, with its principal place

24   of business at 90 Woodlands Avenue 7, Singapore 737911, Singapore.  During the Conspiracy

25   Period, Seagate Singapore assisted Seagate Technology LLC at times with Seagate's purchase of

26   the affected HDD suspension assemblies directly from certain Defendants at prices illegally fixed

27   by Defendants, and was thus injured in its business or property as a result of Defendants'

28   anticompetitive and unlawful conduct.

32.     Plaintiff Seagate Technology International, a Cayman Islands company, is a wholly owned indirect subsidiary of Seagate Technology plc, located at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands with its principal place of business in Grand Cayman, Cayman Islands.   During the Conspiracy Period, Seagate International assisted Seagate Technology LLC at times with Seagate's purchase of the affected HDD suspension assemblies directly from certain Defendants at prices illegally fixed by Defendants, and was thus injured in its business or property as a result of Defendants' anticompetitive and unlawful conduct.

**b.     NHK Defendants**

33.     Defendant NHK Spring Co. Ltd. ("NHK Spring") is a Japanese corporation with its principal place of business located at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004, Japan. During the Conspiracy Period, NHK Spring manufactured, marketed, sold and/or distributed HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

34.     Defendant NHK International Corporation ("NHK International") is a U.S. subsidiary established by NHK Spring in October 1976, with its principal place of business located at 46855 Magellan Drive, Novi, Michigan 48377.  During the Conspiracy Period, NHK International supplied, serviced, and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

35.     Defendant NHK Spring (Thailand) Co., Ltd. ("NHK Thailand") is a Thailand-based subsidiary of NHK Spring, with its principal place of business located at Bangna Tower A, 6th-7th floor 2/3 Moo 14, Bangna-Trad Rd., (km. 6.5), Bangkaew, Bangplee, Samutprakarn 10540 Thailand.   During the Conspiracy Period, NHK Thailand manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

36.     Defendant NHK Spring Precision (Guangzhou) Co., Ltd. ("NHK Guangzhou") is a China-based subsidiary of NHK Spring, with its principal place of business located at No. 189 LianGuang Road, Eastern Sub-District, Guangzhou Economic & Technological Development Dist.,

Guangdong Province, 510760, China.   During the Conspiracy Period, NHK Guangzhou manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

37.   Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT DongGuan") is a China-based subsidiary of NHK Spring, with its principal place of business located at Conrad Hi-Tech Park, Shangsha, ZhenAn Road, ChangAn Town, Dongguan, Guangdong, 523830 China.   During the Conspiracy Period, NAT DongGuan manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

38.   Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a China-based subsidiary wholly owned by NHK Spring, with its principal place of business located at Suite 15b-17, 9/F, Tower 3, China Hong Kong City, 33 Canton Rd., T.S.T., Kowloon, Hong Kong.   During the Conspiracy Period, NAT H.K. manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

39.   Defendants NHK Spring, NHK International, NHK Thailand, NHK Guangzhou, NAT DongGuan, and NAT H.K. are together referred to herein as "NHK."

**c.    TDK Defendants**

40.   Defendant TDK Corp. is a Japanese corporation with its principal place of business located at 2-5-1 Nihonbashi, Chuo-ku, Tokyo, 103-6128, Japan.   TDK Corp. has a California-based branch located at 1745 Technology Drive, Suite 200, San Jose, CA 95110.   During the Conspiracy Period, TDK Corp. manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

41.   Defendant Magnecomp Precision Technology Public Co. Ltd. ("MPT") is a Thailand-based subsidiary of TDK Corp., with its principal place of business located at 162 M.5 Phaholyothin Road, T.Lamsai A.Wangnoi, Ayutthaya 13170, Thailand.   During the Conspiracy Period, MPT manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

42.     Defendant SAE Magnetics (H.K.) Ltd. ("SAE Magnetics") is a China-based subsidiary wholly owned by TDK Corp., with its principal place of business located at 6 Science Park East Avenue, Hong Kong Science Park, Hong Kong, China.  During the Conspiracy Period, SAE Magnetics manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

43.     Defendant Headway is a Delaware corporation wholly owned by TDK Corp., with its principal place of business located at 682 South Hillview Drive, Milpitas, California 95035. Headway provides recording head products to the HDD industry and employs approximately 800 people in engineering, manufacturing and administration roles in Milpitas, California.  During the Conspiracy Period, Headway manufactured and supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

44.     Defendant Hutchinson Technology Inc. ("Hutchinson" or "HTI") is a Minnesota corporation that was acquired by TDK Corp. in 2016, with its principal place of business located at 40 West Highland Park Drive NE, Hutchinson, Minnesota 55350.  During the Conspiracy Period, Hutchinson manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

45.     Defendants TDK Corp., MPT, SAE Magnetics, Hutchinson, and Headway are together referred to herein as "TDK," except where HTI is called out individually.

**d.      Agents and Co-Conspirators**

46.     On information and belief, other persons, corporations, partnerships, or business entities not named as Defendants in this Complaint are co-conspirators with Defendants in their unlawful restraints of trade, and have performed acts and made statements in furtherance thereof. In particular, over three dozen individuals who were employed by one or more Defendant have been implicated in the anticompetitive conduct by government enforcement agencies.

47.     These other persons or entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to fix the prices of, and allocate market

shares for, HDD suspension assemblies. Seagate reserves the right to name some or all of these persons or entities as Defendants at a later date.

## V. FACTUAL ALLEGATIONS

### a. Hard Disk Drives

48.     An HDD is a computer storage device that electronically stores data, such as documents, pictures, and operating systems, using magnetic recording heads to read and write to rapidly spinning disks. HDDs can be internal or external, and are primarily used in four broad segments: desktop HDDs, mobile (laptop) HDDs, enterprise HDDs, and consumer electronics HDDs.

49.     HDDs comprise, among other things, magnetic disks, heads, and a motor. A motor-driven spindle hub rotates the disks, each of which has data recorded electromagnetically in concentric circles, or tracks, on the disk. A magnetic head, similar to a phonograph arm, reads or writes the information on the tracks. Two heads, one on each side of a disk, read or write the data as the disk spins.

**Figure 1: Physical Structure of Hard Disk Drive[4]**



---

[4] Sarah Felix et al., *Strain Sensing With Piezoelectric Zinc Oxide Thin Films for Vibration Suppression in Hard Disk Drives*, (Jan. 2008), *available at* https://www.researchgate.net/publication/242079742_Strain_Sensing_With_Piezoelectric_Zinc_Oxide_Thin_Films_for_Vibration_Suppression_in_Hard_Disk_Drives.

**b.**     **Suspension Assemblies**

50.     HDDs cannot read and write data without a suspension assembly.   Suspension assemblies serve the essential functions of (i) securing the read/write head in position over the disk, (ii) maintaining a constant height, and (iii) linking the read/write head to the electronic circuitry of the HDD.  Given their importance (and perhaps also due to this conspiracy), suspension assemblies are one of the *highest cost* components of an HDD (and for certain HDDs are the highest cost component).

51.     Suspension assemblies hold the recording heads in close proximity to the disks and provide the electrical connection from the recording heads to the HDDs' circuitry.  Suspension assemblies position the magnetic read/write head above the data on the surface of the spinning disks in the HDD.  The distance between the read/write head and the disk platter is referred to as "flying height."  The accuracy of this positioning over the tracks on the disk largely determines areal density and subsequently each disk's data capacity.

52.     A modern HDD's flying height is smaller than the circuit size of most modern microprocessors today.  In other words, the flying height is thinner than a finger print.   The suspension has a built-in actuator that holds the head within a very small tolerance of the centerline of the data track.  Thus, HDD suspension assemblies are essential to the reliability and performance of HDDs.

**Figure 2: HDD Suspension Assembly[5]**



c.      **Market Characteristics and Trends That Motivated and Facilitated the Conspiracy**

53.     The HDD suspension assemblies proved to be prone to successful price-fixing and market allocation during the Conspiracy Period.  Defendants exploited the industry and product factors described below to achieve their anti-competitive purpose and conduct throughout the Conspiracy Period.

i.      **Substitutability**

54.     It is easier to form and sustain a cartel when the products are substitutable because it is easier for conspirators to agree on prices to charge and to monitor those prices once an agreement is formed.

55.     While HDD suspension assemblies require complex technical design per specific HDD projects, suspension assemblies are often interchangeable within an HDD project.

56.     HDD suspension assemblies produced by different manufacturers can often be freely substituted for one another once an HDD project is launched, rendering one brand essentially

_____

[5] Kazemi M.R., *Suspension Assembly for Hard Disk Drive* (2013), *in* Wang Q.J., Chung Y (eds) Encyclopedia of Tribology, *available at* https://link.springer.com/referenceworkentry/10.1007%2F978-0-387-92897-5_1140.

1   indistinguishable from any other.  Indeed, HDD manufacturers often utilize more than one brand of

2   the same type of HDD suspension assemblies interchangeably within the same HDD.

3       57.    As Defendants recognized prior to and throughout the Conspiracy Period, there was

4   often substitutability of HDD suspension assemblies among Defendants' products, rendering the

5   market especially susceptible to maintaining the anticompetitive conduct.  Pricing is the primary

6   differential between competitors and, accordingly, the principal basis upon which purchasing

7   decisions on HDD suspension assemblies are made.  Therefore, curtailing price competition, as

8   Defendants did here, effectively eliminated competition.

9       58.    Moreover, as a result of the substitutability of their product offerings, Defendants

10   were able to more readily agree on uniform prices and more easily detect any Defendant's failure to

11   adhere to those prices.

12       **ii.**    **Market Concentration**

13       59.    The HDD suspension assembly industry was highly concentrated during the

14   Conspiracy Period.  Defendants dominate the HDD suspension assembly market, holding a

15   combined worldwide market share of approximately 90% as of 2016.

16       60.    The HDD suspension assembly market was competitive in the 1980s, but the market

17   has since consolidated substantially and has become highly concentrated.  Additionally, there has

18   been increased vertical integration of HDD suppliers like TDK that formerly depended on

19   independent component suppliers in their manufacturing of HDDs.

20       61.    For example, Defendant TDK acquired a formerly independent HDD suspension

21   assembly manufacturer in 2007 and had fully integrated that acquisition by 2009.  HTI, at one time

22   the largest manufacturer of HDD suspension assemblies, was also acquired by TDK in 2016.  Prior

23   to the acquisition, HTI had gone through its own process of consolidation and was a principal

24   supplier of HDD suspension assemblies to Seagate, Western Digital Corporation (headquartered in

25   San Jose, CA), and SAE Magnetics/TDK (Tokyo, Japan).  HTI's business is now consolidated

26   within the TDK family.

27

28

62.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.  Market consolidation for HDD suspension assemblies has continued to the point where there are now only two major global suppliers: TDK and NHK.

63.     No notable new manufacturers have entered the HDD suspension assembly industry or effectively challenged Defendants, which are collectively dominant in the HDD suspension assembly market, since before the beginning of the Conspiracy Period.

### iii.     Barriers to Entry

64.     Under basic economic principles, a collusive arrangement that raises product prices above competitive levels may attract new entrants to the market seeking to benefit from the supracompetitive pricing.  However, where there are significant barriers to entry, new entrants are much less likely to enter the market.  Thus, barriers to entry help facilitate the formation and maintenance of cartels.

65.     There are substantial barriers to entry in the HDD suspension assembly industry that would require substantial time, resources, and industry knowledge to even potentially overcome. This is particularly true here where manufacturing HDD suspension assemblies requires the ability to produce precision assemblies in large volumes.  As Defendant HTI conceded, "We believe that the number of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."[6]

66.     Defendants also collectively own the majority of patents for HDD suspension assemblies, placing a significant and costly burden on potential new entrants which must avoid infringing Defendants' patents when entering the market with a new product.

67.     Entry is thus unlikely in the supply of suspension assemblies, which further facilitates collusion and reinforces market concentration as discussed above.   And because suspension assemblies are a fundamental and necessary component of HDDs, these factors meant that Seagate had no meaningful ability to choose alternative suppliers to Defendants, which rendered

---

[6] William McConnell, *Hutchinson Shares Extend Slide on Continued FTC Antitrust Review*, THESTREET (Jan. 5, 2016), *available at* https://www.thestreet.com/story/13412469/1/hutchinson-shares-keep-falling-on-extended-ftc-antitrust-review.html.

1    price competition between the suppliers the only way to ensure that Seagate paid a competitive

2    price.

3                        **iv.    Inelastic Demand**

4           68.    Demand inelasticity for HDD suspension assemblies further facilitated the

5    conspiracy, allowing Defendants to raise prices to supracompetitive prices without significantly

6    undermining sales volumes.  Demand inelasticity means that price variations do not significantly

7    impact sales volumes.  This phenomenon is experienced when a product has an important function,

8    but has few or no practical substitutes.  It facilitates collusion by ensuring the conspiracy will not

9    fall apart due to purchasers reducing their purchases of the price-fixed goods.

10           **d.    Direct Evidence of the Conspiracy**

11           69.    Direct evidence establishes the existence of the conspiracy and participation by all

12   three Defendants—HTI, NHK, and TDK (as noted, TDK acquired HTI in 2016).  The allegations

13   herein reflect direct evidence and admissions secured by enforcement agencies around the world.

14           70.    In April 2018, CADE reported that the conspiratorial conduct began as early as 2003

15   and continued until at least 2016.[7]  According to CADE, *all three Defendants*—HTI, NHK, and

16   TDK—and certain of their subsidiaries participated in the conspiratorial conduct, along with 38

17   individuals from the Defendants.  Indeed, CADE reported that "five companies and thirty-eight

18   individuals would have *participated* in the collusion."[8]  The individuals identified included high-

19   level sales and executive management personnel from the Defendants.

20           71.    CADE further reported that it has "compelling evidence" of conspiratorial conduct

21   of the three Defendants—HTI, NHK, and TDK—comprising: "(i) [p]rice fixing in response to

22   customer quotation orders; (ii) [m]arket division and (iii) [s]haring of commercial and competitively

23   sensitive information.  Sharing of commercially and competitively sensitive information included

24   but was not limited to information on (iii.1) [c]urrent, potential and proposed prices, for suspension

25

26   [7] Nota Técnica 4/2018 (nº SEI 0459666) PROCESSO ADMINISTRATIVO nº 08700.006006/2017-61 (apartado de
     acesso restrito nº 08700.007735/2017-35), ¶ 4 (working translation).

27   [8] Press Release, CADE's General Superintendence Probes Cartel in the Global Market for Hard Disk Components (Apr.
     26, 2018), *available at*  http://en.cade.gov.br/cades-general-superintendence-probes-cartel-in-the-global-market-for-
28   hard-disk-components-1.

assemblies, (iii.2) [p]rivate customer bidding processes, (iii.3) [a]llocation of customer volumes, (iii.4) [m]anufacturing capacity of each company, and (iii.5) [u]ser fees for each company, for the purpose of stabilizing prices and reducing competition in sales of suspension assemblies. . . . These conducts were rendered feasible by way of meetings and bilateral exchanges of emails."[9]

72.    CADE ultimately concluded based on the above that there was "existence of robust evidence of violations" of the competition laws in Brazil.

73.    In the United States, the DOJ similarly found that the evidence showed the "conspiracy consisted of a continuing agreement, understanding, and concert of action . . . to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere."[10]

74.    The DOJ further concluded that NHK and its co-conspirators, through their officers and employees, including high-level personnel, participated in the illegal conduct.  On information and belief, the co-conspirators include TDK and HTI.  The DOJ determined that NHK and its co-conspirators engaged in the following activities for the purpose of forming and carrying out the conspiracy:

    a.    discussions and meetings in the United States and elsewhere, during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies sold in the United States and elsewhere;

    b.    exchanging HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere, as a means of implementing the agreement not to compete;

    c.    relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that

---

[9] Nota Técnica 4/2018 (nº SEI 0459666) PROCESSO ADMINISTRATIVO nº 08700.006006/2017-61 (apartado de acesso restrito nº 08700.007735/2017-35), ¶5, ¶6 (emphasis omitted) (working translation).
[10] Information, United States of America v. NHK Spring Co., Ltd, 2:19-cr20503, ¶7 (E.D. Mich. Jul. 29, 2019), ECF No. 1.

purchased HDD suspension assemblies and produced HDDs for sale in, or delivery to, the United States and elsewhere;

d. selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere for incorporation into products sold into the United States at collusive and noncompetitive prices; and

e. accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.

75.    NHK *admitted* to participating in the conspiratorial conduct described in the preceding paragraph as part of its plea agreement with DOJ entered on July 26, 2019, under which NHK further agreed to pay a fine of $28.5 million.[11]  On September 23, 2019, the District Court for the Eastern District of Michigan accepted NHK's guilty plea.  NHK admitted to engaging in this conduct from at least as early as May 2008 and continuing until at least April 2016.  Notably, the relevant conspiracy period was limited to those dates "[f]or purpose of this Plea Agreement" only.

76.    NHK further *admitted* as part of the plea agreement that an unnamed Company A also participated in a conspiracy which had the primary purpose of fixing the prices of HDD suspension assemblies sold in the United States and elsewhere.  NHK also admitted that Company A participated in the aforementioned activities for the purpose of forming and carrying out this conspiracy.  NHK further admitted that Company A, through its officers and employees, reached agreements with NHK to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies sold in the United States and elsewhere.

77.    On information and belief, Company A described in NHK's plea agreement with DOJ is TDK.  Due to market consolidation as described herein, including TDK's acquisition of HTI, there are now only two major global suppliers of HDD suspension assemblies: TDK and NHK.  Moreover, the JFTC issued a cease and desist order to and imposed a surcharge on those two remaining global HDD suspension assembly suppliers:  NHK and TDK.

---

[11] See Press Release, *Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drive*, (July 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.

78.     As part of its plea agreement with the DOJ, NHK expressly agreed that it will not make any statement, in litigation or otherwise, contradicting the acceptance of responsibility for participation in the conspiracy or any of the facts describing its participation or the participation of Company A in the conspiracy as set forth in the plea agreement.

79.     On September 4, 2019, DOJ sent a letter to Seagate indicating that it is a victim of the conspiracy.  In the letter, DOJ states that DOJ has filed a criminal case in the Eastern District of Michigan charging NHK with a violation of Section 1 of the Sherman Act "for engaging in an unlawful conspiracy with its coconspirators to suppress and eliminate competition by fixing prices for HDD suspension assemblies sold in the United States and elsewhere, which resulted in HDD suspension assemblies being sold at collusive and noncompetitive prices."

80.     On February 13, 2020, DOJ filed an indictment in the United States District Court for the Northern District of California against Hiroyuki Tamura and Hitoshi Hashimoto, two former NHK executives involved in the sale and pricing of NHK's HDD suspension assemblies.  Hiroyuki Tamura was the general manager of NHK Spring's disk drive suspension and component sales department from approximately 2007 through April 2013.  Hitoshi Hashimoto held the same position from April 2013 through April 2016.[12]

81.     According to the indictment, the DOJ determined that Tamura, Hashimoto, and their co-conspirators engaged in the following activities:

a.  attending meetings and engaging in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

b.  agreeing during those meetings and communications to refrain from competing on prices for and stabilize, maintain, and fix the prices of HDD suspension assemblies to be sold in the United States and elsewhere;

---

[12] Indictment, United States of America v. Hitoshi Hashimoto and Hiroyuki Tamura, 3:20-cr-00070-JD, ¶2-4 (N.D. Cal. Feb. 13, 2020), ECF No. 1.

c.  agreeing during those meetings and communications to allocate their respective market shares for HDD suspension assemblies to be sold in the United States or elsewhere;

d.  discussing and exchanging HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

e.  communicating with sales employees in the United States and elsewhere and directing those employees to exchange HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

f.  relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere;

g.  selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices; and

h.  accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.

82.     HTI also was a knowing participant in the conspiratorial conduct.  As stated by CADE, HTI was one of the entities that "demonstrated some degree of participation" in the conduct.[13]  HTI was also involved in the DOJ's investigation.  On July 26, 2016, HTI received a letter from the DOJ requesting documents relating to the investigation and expressed its intent to fully cooperate with the DOJ's investigation.[14]

83.     On information and belief, TDK admitted to engaging in price-fixing with NHK as part of its leniency applications to government agencies.  On May 6, 2016, TDK applied for leniency

---

[13] Nota Técnica 4/2018 (nº SEI 0459666) PROCESSO ADMINISTRATIVO nº 08700.006006/2017-61 (apartado de acesso restrito nº 08700.007735/2017-35), ¶ 4.

[14] *Hutchinson Technology Provides Update on Legal and Regulatory Actions*, GLOBENEWSWIRE (July 27, 2016), *available at* https://www.globenewswire.com/news-release/2016/07/27/859501/0/en/Hutchinson-Technology-Provides-Update-on-Legal-and-Regulatory-Actions.html.

1    with the JFTC.[15]  In July 2016, the JFTC raided Defendant NHK and Defendant TDK (or certain of

2    their subsidiaries) based on suspected coordinated price fixing activity by the two companies for

3    HDD suspension assemblies.  On February 9, 2018, the JFTC issued a cease and desist order to

4    NHK and TDK, finding that they substantially restrained competition in the HDD suspension

5    assembly market by agreeing to maintain sale prices.  By that point in time, TDK had acquired HTI.

6    The JFTC imposed a 1.1 billion yen (approximately $9.9 million) surcharge on NHK.[16]

7           84.    The JFTC similarly concluded that at least TDK and NHK substantially restrained

8    competition in the HDD suspension assembly market by agreeing to maintain sales prices.  The

9    JFTC further found that TDK and NHK made particular efforts to ensure the efficacy of their price-

10   fixing agreement between August 31, 2007 and January 28, 2009, during which time their sales

11   representatives held numerous meetings to confirm their price-fixing strategy.

12          85.    The JFTC further concluded that in order to implement the conspiratorial agreement

13   TDK and NHK would confirm the pricing that they would quote with each other and exchange

14   information about the demand forecast of suspensions.

15          86.    The purpose of at least some of the communications between NHK and TDK in

16   furtherance of their conspiracy was to try to keep prices for suspension assemblies they sold to

17   Seagate higher than those products otherwise would have been sold to Seagate.

18          87.    At least one purpose of the conspiracy TDK and NHK entered into was to eliminate

19   or ease any price war or price competition between TDK and NHK on sales of suspension assemblies

20   to Seagate.

21          88.    In sum, in order to raise, stabilize and/or slow the decline of prices of HDD

22   suspension assemblies sold to Seagate, Defendants TDK, NHK and HTI conspired to suppress and

23   eliminate competition for HDD suspension assembly sales by fixing prices, exchanging bidding

24   information, agreeing on bids, and allocating their sales.

25

26

27
     ───────────────────
28   [15] JFTC Cease and Desist Order to the Manufacturers of Suspension for Hard Disk Drives (Feb. 9, 2018), available
     at https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1_files/201802betten.pdf (working translation).
     [16] JFTC Press Release (Feb. 9, 2018), *available at* https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1.html.

89.     TDK and NHK have admitted to the existence of this conspiracy in leniency applications and a guilty plea, respectively.   These admissions constitute direct evidence of the alleged conspiracy.

      **e.**     **Indirect Evidence of the Conspiracy**

90.     Indirect evidence also establishes the existence of the conspiracy and participation by all three Defendants—HTI, NHK, and TDK.

91.     By the early 2000s, HDD suspension assemblies were subject to declining prices. Defendants therefore had a motive to conspire, and in a concentrated industry with frequent contacts between competitors, had extensive opportunities to do so.

92.     In a competitive market, each Defendant would have had incentive to make increasingly competitive bids.   Yet throughout the Conspiracy Period, Defendants engaged in coordinated pricing patterns.   In particular, in response to Seagate's various requests for bids, each of the three suppliers from which Seagate purchased (HTI, NHK, and MPT) would set prices for different types of HDD suspension assemblies in a way that resulted in one company consistently being the high bidder and one company consistently being the low bidder on any given product.

93.     The three suppliers typically justified their respective prices based on costs and other normal market factors, thus deceiving Seagate as to the reasons for their bidding patterns.   Such actions against economic interest, amplified by the knowledge gained through the global investigations, constitute indirect evidence of the conspiracy in addition to the extensive direct admissions cited above.

94.     In sum, during the Conspiracy Period, Defendants entered into agreements with each other to refrain from price competition and allocate their respective market shares for HDD suspension assemblies.   Pursuant to their agreements not to compete, Defendants exchanged pricing information, including anticipated pricing quotes, which they used to inform their negotiations with U.S. and foreign customers that purchased suspension assemblies and produced HDDs for sale in, or delivery to, the United States and elsewhere.   As a result of these agreements, Defendants charged Seagate artificially high prices for HDD suspension assemblies.

95.     As a result of the conspiracy, the three HDD suspension assembly suppliers charged supra-competitive prices on HDD suspension assemblies supplied in the United States and supplied outside the United States for incorporation into products sold or supplied in the United States.

96.     The conspiracy was knowingly formed and was in existence from as early as 2003 through at least April 2016; the Defendants knowingly joined and participated in the conspiracy; and as a direct and proximate result of the Defendants' unlawful conduct and subsequent sales of HDD suspension assemblies at supracompetitive prices, Seagate has been injured in its business and property in that it paid more for HDD suspension assemblies than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**f.     Defendants' Misuse of Seagate's Confidential Information**

97.     During and throughout the Conspiracy Period, Seagate LLC and Defendants entered into various nondisclosure agreements and Supplements to the same (collectively, "NDAs") that applied to the negotiations of all purchases at issue in this complaint.[17]  Seagate LLC fully performed all of its duties and obligations under, and complied with, the terms of the NDAs during and throughout the Conspiracy Period.

98.     Pursuant to the various NDAs, Defendants were provided with confidential Seagate business information – including pricing and volume information, forecasts, and product designs – for the limited business purpose of enabling Defendants to submit bids and proposals for HDD suspension assemblies to be included in Seagate's products.   To that end, Seagate and the Defendants entered into separate NDAs in contemplation of the exchange of confidential business information that is necessarily attendant to the purchasing process.

99.     Including as set forth in the NDAs, the parties contemplated disclosure of confidential business information by Seagate LLC as well as its corporate affiliates to individual Defendants, and the agreements were intended to protect such disclosures, which are integral to the business operations and well-being of all of the Seagate entities.   For example, the Master Nondisclosure Agreement with MPT states that its terms "shall apply" when the signatories "or [their] affiliates . . . disclose[] Confidential Information to the other or its affiliates . . . under this

---

[17] Seagate International was also a signatory to the Master Nondisclosure Agreement with TDK.

1   Agreement."   The Master Nondisclosure Agreements with TDK and NHK contained the same

2   language.

3       100.   The parties further entered into the NDAs with the intent to confer a direct benefit

4   upon Seagate LLC as well as its corporate affiliates, including Seagate Thailand.

5       101.   The NDAs contained express restrictions governing Defendants' use and disclosure

6   of Seagate's confidential business information, and did not permit use or disclosure of such

7   information to illegally profit at Seagate's expense.   Among other things, Seagate LLC's Master

8   Nondisclosure Agreement with each of MPT, NHK, and HTI expressly state that they "may only []

9   use[]" that Confidential Information "for the benefit of Seagate."   The Master Nondisclosure

10  Agreement with TDK likewise stated that Seagate's Confidential Information "may only be used . .

11  . as required for assessing or carrying out any business transactions between the Parties."   And the

12  Master Nondisclosure Agreement with SAE Magnetics stated that Seagate's Confidential

13  Information "may only be used" for "evaluation and testing."

14      102.   In connection with their conspiracy not to compete and in furtherance of their

15  conspiracy, Defendants misused, exchanged, and/or disclosed Seagate's confidential business

16  information to one another in breach of the NDAs, in order to charge Seagate artificially high prices.

17      103.   As a direct and proximate result of the Defendants' unlawful and inequitable conduct,

18  Seagate was damaged (and Defendants were unjustly enriched) by purchasing HDD suspension

19  assemblies at supracompetitive prices.

20      **g.      Trade and Commerce Affected by the Conspiracy**

21      104.   The conduct of Defendants and their co-conspirators has taken place in, and affected

22  the continuous flow of interstate and foreign trade and commerce of, the United States.

23      105.   During the Conspiracy Period, Defendants collectively controlled approximately

24  90% of the global supply of HDD suspension assemblies.   The conspiracy alleged herein thus

25  affected billions of dollars of commerce.

26      106.   Defendants' sales in the United States and sales outside the United States of

27  suspension assemblies destined for the United States account for a significant portion of these

28

1    sizable revenues.  As such, the U.S. HDD suspension assembly market was a major focus of the

2    conspiracy.

3         107.    Each Defendant HTI, NHK, TDK—itself and/or by or through one or more of its

4    subsidiaries—sold HDD suspension assemblies in the United States in a continuous and

5    uninterrupted flow of interstate and international commerce, including through and into this judicial

6    district.  Each further sold HDD suspension assemblies in the United States; for delivery to the

7    United States; and outside the United States for incorporation into HDDs destined for sale

8    worldwide, including the United States, at collusive and supracompetitive prices.  Defendants were

9    fully aware that these suspension assemblies would be in products destined for customers in the

10   United States.

11        108.    All three Defendants—HTI, NHK, and TDK—also primarily negotiated sales of

12   suspension assemblies via in-person meetings in the United States, telephone and video conferences

13   in the United States, and email communications sent from the United States.

14        109.    For these and other reasons, Defendants therefore knowingly and intentionally sent

15   price-fixed HDD suspension assemblies into the stream of commerce of the United States.  Such

16   conduct was meant to produce and did in fact produce a substantial harmful effect on domestic and

17   import commerce in the United States in the form of artificially high prices being paid for HDD

18   suspension assemblies by U.S. customers, including Seagate.  Defendants engaged in illegal conduct

19   both inside and outside of the United States that caused direct, substantial, and reasonably

20   foreseeable anticompetitive effects on domestic and import commerce in the United States.

21        110.    Defendants' unlawful activities with respect to Seagate's purchases of HDD

22   suspension assemblies had, and continue to have, a direct, substantial, and reasonably foreseeable

23   effect on United States domestic and import commerce that gives rise to the claims asserted herein.

24        111.    The unlawful conduct described herein, and its anticompetitive effect on U.S.

25   domestic and import commerce, caused antitrust injury to Seagate in the United States in the form

26   of supracompetitive prices for HDD suspension assemblies, which were the natural, foreseeable,

27   and intended consequence of Defendants' anticompetitive conduct.  It also caused antitrust injury

28   to Seagate arising directly from the unlawful conduct's impact on U.S. import trade and commerce

in the form of supracompetitive prices for HDD suspension assemblies purchased for incorporation into HDD products to be sold in the United States.

112.    During the Conspiracy Period, HDD suspension assembly prices were higher and decreased less than they would have under competitive market conditions, were stabilized, and in some instances, increased.  As a result, Seagate paid overcharges totaling hundreds of millions of dollars for billions of HDD suspension assemblies purchased throughout the Conspiracy Period.

113.    It will be possible to measure and quantify the overcharges that Seagate paid using economic analyses.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge.  Thus, the economic harm to Seagate can and will be quantified.

114.    Much of the relevant information is in the possession and control of Defendants and not Seagate, so the full nature and extent of the conspiracy's anticompetitive effects are unknown to Seagate at this time.

## VI.    CONTINUING VIOLATION, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

115.    This Complaint alleges a continuing course of conduct (including conduct within the applicable limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm, including within the applicable statutes of limitations.

116.    Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Seagate.

117.    Each time Seagate purchased affected HDD suspension assemblies, Seagate suffered a separate and independent injury flowing from Defendants' anticompetitive conduct.

118.    Because Defendants have engaged in a continuing course of conduct, Seagate's claims are timely.

119.    During the Conspiracy Period, Seagate had neither actual nor constructive knowledge of the pertinent facts upon which its claims are predicated, despite diligence in trying to discover such facts.

120.   The doctrine of fraudulent concealment therefore tolls the statute of limitations on the claims asserted herein by Seagate.  Seagate did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until much later after the Conspiracy Period because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

121.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

122.   In particular, when Seagate needed to contract for HDD suspension assemblies, it requested bids from representatives of each Defendant.  Those representatives represented that they were bidding in a serious attempt to secure the business and that their pricing reflected normal market factors like costs, demand for their products, and other lawful factors.

123.   Those representations were false because they failed to disclose that Defendants had exchanged information about their bids, agreed to allocate market volumes, and priced based on their conspiracy and the price-fixing agreements that they reached.  As such, the statements made by Defendants during bidding processes for Seagate's business constituted affirmative acts of concealment of their conduct by making false representations about each Defendant's desire to provide a competitive bid and justifications for its proposed prices.

124.   Seagate's reliance on those representations was reasonable because competing suppliers typically submit bids that reflect an effort to secure the potential business and do not unlawfully coordinate on price, customer volumes, and bidding.  Given these representations, Seagate was reasonably diligent in discovering the facts underlying its claims.  It had no reason to suspect anticompetitive agreements until the various government investigations brought those agreements to light.

125.   Moreover, by its very nature, the conspiracy was inherently self-concealing.  HDD suspension assemblies are not exempt from antitrust regulation and, thus, Seagate reasonably considered the HDD suspension assembly industry to be a competitive industry.

126.   Because the conspiracy was self-concealing and affirmatively concealed by Defendants and their co-conspirators, Seagate had no knowledge of the conspiracy, or of facts or

1  information that would have caused a reasonably diligent person to investigate whether a conspiracy

2  existed.  It could not have been aware of the conduct until, at the earliest, the public announcement

3  of the JFTC investigation in July 2016.

4      127.    For these reasons, the statute of limitations applicable to Seagate's claims was tolled

5  and did not begin to run until at least July 2016.

6      128.    Additionally, Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), suspended the

7  running of the statute of limitations on Seagate's federal claim as of July 29, 2019, the date on which

8  the DOJ filed a criminal action against NHK.  The action against NHK is a "criminal proceeding . .

9  . instituted by the United States to prevent, restrain, or punish violations of" the Sherman Act.

10  Seagate's case is "based in whole or in part on [the] matter complained of" in the criminal action,

11  and the criminal action terminated on December 23, 2019, less than one year prior to the filing of

12  this Complaint.

13  **VII.    SEAGATE'S INJURIES**

14      129.    By reason of the violations of the antitrust law and breaches of Seagate's NDAs

15  alleged herein, Seagate has sustained injury to its business or property, having paid higher prices for

16  HDD suspension assemblies than it would have paid in the absence of Defendants' unlawful

17  conduct, and, as a result, has suffered damages in an amount presently undetermined.  This is, *inter*

18  *alia*, an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

19      130.    As a purchaser of HDD suspension assemblies, Seagate suffered direct, substantial,

20  and reasonably foreseeable injuries as a result of the conspiracy.

21      131.    Seagate purchased HDD suspension assemblies directly from certain Defendants at

22  prices that were artificially inflated as a result of the conspiracy.

23      132.    Throughout the Conspiracy Period, Defendants controlled the supply of HDD

24  suspension assemblies, forcing Seagate to purchase HDD suspension assemblies at artificially

25  inflated prices.

26      133.    Overcharges due to price-fixing agreements and other anticompetitive collusion are

27  among the injuries the Sherman Act is intended to prevent, and flow from the competitive harms

28  that make such collusion unlawful.  Accordingly, Seagate suffered antitrust injury, among other

harm, in connection with its purchases of HDD suspension assemblies during the Conspiracy Period, in an amount equal to the total of the overcharges it paid, to be determined at trial.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

**Restraint of Trade in Violation of the Sherman Act § 1,
15 U.S.C. § 1 (Alleged against all Defendants)**

134.   Seagate incorporates by reference the allegations in the preceding paragraphs.

135.   Beginning as early as 2003 and continuing through at least April 2016 (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of HDD suspension assemblies sold directly to U.S. purchasers.

136.   In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for HDD suspension assemblies sold to United States purchasers during the Conspiracy Period.

137.   The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

138.   The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for HDD suspension assemblies in the United States and elsewhere.

139.   The anticompetitive acts were intentionally directed at the United States market for HDD suspension assemblies and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for HDD suspension assemblies throughout the United States.

140.   For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

      a.   Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of HDD suspension assemblies;

      b.   Allocating customers and market shares among themselves;

      c.   Agreeing to manipulate prices and supply of HDD suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

      d.   Exchanging competitively sensitive information, including anticipated pricing quotes;

      e.   Relying on agreements not to compete and using exchanged information to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

      f.   Selling HDD suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

141.   As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for HDD suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

142.   The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

### COUNT II

**Restraint of Trade in Violation of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16720 et seq.  (Alleged against all Defendants)**

143.   Seagate incorporates by reference the allegations in the preceding paragraphs.

144.   Beginning as early as 2003 and continuing through at least April 2016 (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business

and Professions Code §§ 16720 et seq., by artificially reducing or eliminating competition for the pricing of HDD suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

145.   In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for HDD suspension assemblies sold for incorporation into HDDs purchased in California during the Conspiracy Period.

146.   The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

147.   The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for HDD suspension assemblies in California and elsewhere.

148.   The anticompetitive acts were intentionally directed at the California market for HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for HDD suspension assemblies throughout California and elsewhere.

149.   For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

      a.   Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of HDD suspension assemblies;

      b.   Allocating customers and market shares among themselves;

      c.   Agreeing to manipulate prices and supply of HDD suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

e.  Relying on agreements not to compete and using exchanged information to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

f.  Selling HDD suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

150.  As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for HDD suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

151.  The alleged contract, combination, or conspiracy is a per se violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq.

**COUNT III**

**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 et seq. (Alleged against all Defendants)**

152.  Seagate incorporates by reference the allegations in the preceding paragraphs.

153.  Beginning as early as 2003 and continuing through at least April 2016 (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq., by artificially reducing or eliminating competition for the pricing of HDD suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

154.  In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for HDD suspension assemblies sold to purchasers in California during the Conspiracy Period.

155.  The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

officers, agents, employees, or representatives while actively engaged in the management of their affairs.

156.   The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for HDD suspension assemblies in California and elsewhere.

157.   The anticompetitive acts were intentionally directed at the California market for HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for HDD suspension assemblies throughout California and elsewhere.

158.   For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a.  Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of HDD suspension assemblies;

    b.  Allocating customers and market shares among themselves;

    c.  Agreeing to manipulate prices and supply of HDD suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

    e.  Relying on agreements not to compete and using exchanged information to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

    f.  Selling HDD suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

159.   As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured,

1  in that Seagate paid more for HDD suspension assemblies than it would have paid in the absence of

2  Defendants' unlawful conduct.

3      160.    The alleged contract, combination, or conspiracy is an unlawful, fraudulent, and/or

4  unfair act or practice constituting unfair competition in violation of the Unfair Competition Law,

5  California Business and Professions Code §§ 17200 et seq.

6                                    **COUNT IV**

7  **Restraint of Trade in Violation of the Minnesota Antitrust Law of 1971,
Minn. Stat. §§ 325D.49-.66 (Alleged against all Defendants)**

8      161.    Seagate incorporates by reference the allegations in the preceding paragraphs.

9      162.    Beginning as early as 2003 and continuing through at least April 2016 (the exact

10 dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants

11 and their co-conspirators entered into a continuing contract, combination, or conspiracy to

12 unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Law of 1971,

13 Minnesota Statutes §§ 325D.49-.66, by artificially reducing or eliminating competition for the

14 pricing of HDD suspension assemblies with the purpose and/or effect of unreasonably restraining

15 trade and commerce in Minnesota and elsewhere.

16     163.    In particular, Defendants and their co-conspirators have agreed, combined, and

17 conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for HDD

18 suspension assemblies sold to purchasers in Minnesota during the Conspiracy Period.

19     164.    The acts done by the Defendants as part of, and in furtherance of, their and their co-

20 conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

21 officers, agents, employees, or representatives while actively engaged in the management of their

22 affairs.

23     165.    The agreement, combination, or conspiracy among Defendants and their co-

24 conspirators consisted of a continuing agreement, understanding, and concerted action among

25 Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for HDD

26 suspension assemblies in Minnesota and elsewhere.

27     166.    The anticompetitive acts were intentionally directed at the Minnesota market for

28 HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in

1   Minnesota by raising and fixing prices for HDD suspension assemblies throughout Minnesota and

2   elsewhere.

3        167.   For purposes of formulating and effectuating their agreement, combination, or

4   conspiracy, Defendants and their co-conspirators, through their officers and employees, including

5   high-level personnel, did those things they contracted, combined, or conspired to do, including:

6        a.   Participating in meetings and conversations in the United States and elsewhere to

7             discuss pricing and supply of HDD suspension assemblies;

8        b.   Allocating customers and market shares among themselves;

9        c.   Agreeing to manipulate prices and supply of HDD suspension assemblies sold in the

10            United States in a manner that deprived Seagate of free and open competition;

11       d.   Exchanging competitively sensitive information, including anticipated pricing

12            quotes;

13       e.   Relying on agreements not to compete and using exchanged information to inform

14            negotiations with U.S. and foreign customers purchasing HDD suspension

15            assemblies; and

16       f.   Selling HDD suspension assemblies to customers in the U.S. or elsewhere for

17            incorporation into products sold in the U.S. at supracompetitive prices.

18       168.   As a result of the unlawful conduct and acts undertaken in furtherance of the

19   conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured,

20   in that Seagate paid more for HDD suspension assemblies than it would have paid in the absence of

21   Defendants' unlawful conduct.

22       169.   The alleged contract, combination, or conspiracy is a per se violation of the

23   Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66.

24                                 **COUNT V**

25               **Breach of Contract (Alleged against all Defendants)**

26       170.   Seagate incorporates by reference the allegations in the preceding paragraphs.

27       171.   Defendants executed nondisclosure agreements with Seagate LLC during the

28   Conspiracy Period, including Supplements thereto, which were valid and binding contracts.

172.     Defendants were provided with confidential business information pursuant to these agreements.

173.     The parties contemplated disclosure of confidential business information by Seagate LLC as well as its corporate affiliates, and the agreements were intended to protect such disclosures.

174.     The parties entered into the agreements with the intent to confer a direct benefit upon Seagate LLC as well as its corporate affiliates, including Seagate Thailand.

175.     Seagate LLC has fully performed all of its duties and obligations under the nondisclosure agreements.

176.     Pursuant to the nondisclosure agreements, Defendants were required to, among other things, use Seagate's confidential business information only as specified therein and protect Seagate's confidential business information from unauthorized disclosure.

177.     Defendants breached these obligations by misusing, exchanging, and/or disclosing Seagate's confidential business information, as set forth herein.

178.     As a direct and proximate result of Defendants' breach of their nondisclosure agreements, Seagate has suffered actual damages and Defendants have been unjustly enriched.

## IX.     DEMAND FOR JUDGMENT

WHEREFORE, Seagate demands judgment in Seagate's favor and against Defendants adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the state laws enumerated in this Complaint;

B.     Defendants' unlawful contract, combination, and conspiracy is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the state laws enumerated in this Complaint;

C.     Defendants breached their contractual obligations under their NDAs with Seagate;

D.     Seagate's business and property were injured as a result of Defendants' violations and breaches;

E.     Seagate shall recover damages sustained by it as provided by federal and state laws, and a joint and several judgment in favor of Seagate shall be entered against the Defendants in an

1   amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act (15

2   U.S.C. § 15(a));

3       F.      Seagate shall be entitled to appropriate equitable relief, including restitution and

4   disgorgement of Defendants' ill-gotten gains from their violations of federal and state laws;

5       G.      To the fullest extent permitted by law, Seagate shall be awarded pre-judgment and

6   post-judgment interest on the damages it suffered, and such interest shall be awarded at the highest

7   legal rate from and after the date of service of the initial complaint in this action;

8       H.      Seagate shall recover its costs and fees incurred in this suit, including reasonable

9   attorneys' fees as provided by applicable law; and

10      I.      Seagate shall receive such other or further relief as may be just and proper.

11  **X.    JURY TRIAL DEMANDED**

12      Pursuant to Federal Rule of Civil Procedure 38(b), Seagate demands a trial by jury of all

13  the claims asserted in this complaint so triable.

14

15  DATED:  February 18, 2020                 Respectfully submitted,

16

17                                            WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation

18
19                                            By: _/s/ Colleen Bal_____
                                                     COLLEEN BAL

20                                            *Attorneys for Plaintiffs Seagate Technology LLC,*
                                              *Seagate Technology (Thailand) Ltd., Seagate*
21                                            *Singapore International Headquarters Pte. Ltd.,*
                                              *and Seagate Technology International*
22

23

24

25

26

27

28