Kenneth R. O'Rourke, SBN 120144
Jeff VanHooreweghe, SBN 313371
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile:  (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com

Mikaela E. Evans-Aziz (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 497-7710
Facsimile:  (212) 999-5899
mevansaziz@wsgr.com

***Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | **SEAGATE PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Maxine M. Chesney |

1.     This antitrust and breach of contract action seeks to redress a longstanding conspiracy by the leading manufacturers of essential computer technology components called suspension assemblies.  Suspension assemblies are an indispensable component of computer hard disk drives ("HDDs").  The conspirators fixed, raised, and stabilized prices of suspension assemblies and allocated supply shares of these products with an overriding purpose of selling them for higher prices and making more money than they otherwise would have made if there had been robust competition rather than their conspiracy.  The conspirators carried out their price fixing and supply allocation conspiracy by *inter alia* routinely communicating and coordinating their businesses with one another and exchanging and using confidential information in breach of agreements that prohibited the improper disclosures and use of such information.

2.     Plaintiff Seagate Technology LLC ("Seagate LLC"), with Seagate Technology (Thailand) Ltd. ("Seagate Thailand"), Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore"), and Seagate Technology International ("Seagate International"), (collectively, "Seagate" or "Plaintiffs") purchased billions of dollars' worth of suspension assemblies from Defendants.  Seagate purchased these suspension assemblies to make hard drives, which are found in computers everywhere and serve as important technologies and products for major U.S. industries; key health, security, and safety sectors; large and small businesses; and U.S. households.

3.     Plaintiffs bring this action for damages and other relief under the antitrust laws of the United States and various states, as well as for breach of contract, against three Defendant groups:

> **NHK Defendants**:  NHK Spring Co. Ltd., NHK International Corporation, NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring (Thailand) Co., Ltd. (collectively, "NHK");

> **TDK Defendants**:  TDK Corporation, Headway Technologies, Inc., Magnecomp Precision Technology Public Co., Ltd., and SAE Magnetics (H.K.) Ltd. (collectively, "TDK"), and

> **HTI Defendant**:  Hutchinson Technology Inc. ("HTI").

1    5.    Plaintiffs allege as follows on personal knowledge as to themselves and upon

2  information and belief as to all others:

3  **I.    INTRODUCTION**

4    6.    Defendants and their co-conspirators knowingly conspired for more than 12 years

5  not to compete with one another in the pricing and supply of suspension assemblies for hard disk

6  drives.  Specifically, Defendants agreed to fix the prices and allocate market shares of suspension

7  assemblies sold to Seagate from as early as 2003 through at least April 2016 with the effects

8  continuing thereafter (the "Conspiracy Period").  Defendant TDK entered an agreement to acquire

9  HTI on or about November 1, 2015, and completed the acquisition on or about October 6, 2016.[1]

10  As a result of the Defendants' conspiracy, Seagate paid artificially high prices on billions of dollars

11  of its purchases of suspension assemblies.

12    7.    At least five of the world's antitrust agencies have investigated or continue to

13  investigate aspects of this conspiracy:  the United States Department of Justice ("DOJ"), the Japan

14  Fair Trade Commission ("JFTC"), the Administrative Council for Economic Defense in Brazil

15  ("CADE"), the Taiwan Fair Trade Commission ("TFTC"), and the Competition and Consumer

16  Commission of Singapore ("CCCS").  On information and belief, these antitrust agencies initiated

17  these investigations because TDK requested leniency from each of them and *admitted* to

18  participating in the conspiracy.

19    8.    The agencies that have reported the results of their investigations have all found

20  evidence of a conspiracy among the suppliers of suspension assemblies.  For example, on July 29,

21  2019, the DOJ filed a criminal charging document, an Information, against NHK for entering into a

22  conspiracy to eliminate competition for suspension assemblies.

23    9.    On the same day, July 29, 2019, the DOJ announced that NHK entered into a criminal

24  guilty plea agreement (dated July 26, 2019) whereby NHK *admitted* to participating in a conspiracy

25  to price fix suspension assemblies violating the Sherman Act within the United States.

26

27  _____

28  [1] References to "TDK" also include HTI, except where HTI is referenced individually.

1        10.    NHK further *admitted* that "its officers and employees . . . including its high-level personnel, participated in a conspiracy . . . the primary purpose of which was to fix the prices of HDD suspension assemblies sold in the United States and elsewhere."

11.    NHK further *admitted* that, "[i]n furtherance of the conspiracy," it "engaged in discussions and attended meetings" which "took place in the United States and elsewhere" with an unnamed co-conspirator, on information and belief thought to be TDK.  During these discussions and meetings, NHK and its co-conspirator "reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere."

12.    NHK further *admitted* that to effectuate these agreements, employees and officers of NHK and its co-conspirator "exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere."

13.    NHK further *admitted* that NHK and its co-conspirator "relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere."

14.    NHK further *admitted* that (i) it sold suspension assemblies "in, or for delivery to, the United States" and "for incorporation into products" sold in, or for delivery to, the United States; (ii) that suspension assemblies and hard disk drives incorporating affected suspension assemblies "traveled in, and substantially affected, interstate and import trade and commerce;" and (iii) that the conspiracy "had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce."

15.    As the Assistant Attorney General of the DOJ, Makan Delrahim, emphasized when announcing the criminal guilty plea agreement by NHK:  "While these parts are physically small, they are critical to the operation and performance of electronic devices, and their impact on American consumers and businesses is direct and substantial."

-3-

16.     More recently, on February 13, 2020, DOJ filed an indictment in the United States District Court for the Northern District of California charging two former NHK executives with price-fixing and market allocation in the sale and pricing of suspension assemblies.

17.     The suspension assembly conspiracy also touched foreign countries.  On February 9, 2018, the JFTC issued a cease and desist order to and imposed a fine against NHK, finding that NHK and TDK engaged in conspiratorial conduct.

18.     The JFTC order (*see infra* ¶ 91) confirmed that TDK applied for leniency on May 6, 2016 under Articles 1(1) and 6-2 of the Rules on Reporting and the Submission of Supporting Materials in Relation to Immunity from or Reduction of Surcharges (Fair Trade Commission Rule No. 7 of 2005), a condition of which is to (i) be "among the enterprises who committed the relevant violation" and (ii) "submit reports and materials regarding the facts of the violation."[2]

19.     Similarly, it is a requirement in the DOJ Leniency Program[3] and the leniency program of Brazil[4] to admit to an antitrust violation when seeking lighter or no punishment under these programs.

20.     In April 2018, Brazil's antitrust agency, CADE, issued a Technical Report concluding that there was "compelling evidence" that *all three suppliers*—TDK, NHK and HTI—participated in a price-fixing and market division conspiracy.

21.     All three suspension assembly suppliers—NHK, TDK and HTI—have therefore *already been found to have conspired* to fix the prices of suspension assemblies and/or *have admitted* to doing so.  Their conspiracy unjustifiably raised the price of these indispensable components of HDDs.

22.     Seagate is a victim of the Defendants' suspension assembly conspiracy.  After announcing the NHK guilty plea, DOJ wrote to Seagate on September 4, 2019, notifying Seagate

---

[2] See Act Concerning Prohibition of Private Monopolization and Maintenance of Fair Trade, Act No. 54 of 1947 [Anti-Monopoly Act], 7-2(10)(i), available at https://www.jftc.go.jp/en/policy_enforcement/cartels_bidriggings/anti_cartel_files/The_Antimonopoly_Act.pdf.
[3] See Corporate Leniency Policy, available at https://www.justice.gov/atr/file/810281/download (requires the leniency applicant to make a "confession of wrongdoing").
[4] See CADE'S Antitrust Leniency Program Guidelines, available at http://en.cade.gov.br/topics/publications/guidelines/guidelines-cades-antitrust-leniency-program-final.pdf (requires the leniency applicant to "confess the wrongdoing").

1  that it is a potential victim of the conspiracy because it or affiliated entities "may have purchased

2  HDD suspension assemblies that were subject to price-fixing from NHK and/or its coconspirators."

3        23.     In fact, during the Conspiracy Period, Defendants sold suspension assemblies to

4  Seagate within United States domestic and import trade and commerce at artificially inflated prices,

5  as well as outside of the United States in a manner that directly and foreseeably caused harm to

6  Seagate in the United States.  Defendants conspired and sold price-fixed suspension assemblies to

7  Seagate and others with full knowledge that HDDs containing these suspension assemblies would

8  be present in the United States.  As a direct consequence, Seagate suffered significant injury arising

9  out of the conspiracy's impact on the United States.

10        24.     Defendants also misused confidential information that they obtained from Seagate

11  and others.  Seagate provided confidential information under nondisclosure agreements for the

12  limited purpose of enabling Defendants to submit bids and proposals to Seagate and facilitate

13  Defendants' supply of suspension assemblies to Seagate.  Rather than using Seagate's confidential

14  information to reach an agreement with Seagate on suspension assembly pricing and other terms of

15  sale, Defendants instead impermissibly shared the information with one another and improperly

16  used it to further the conspiracy against Seagate.  Seagate brings this action to recover the

17  overcharges it paid for suspension assemblies during the Conspiracy Period, as well as to obtain all

18  additional relief permitted by law.

19        25.     Defendants deceived Seagate and others in order to conceal their conspiracy

20  throughout the Conspiracy Period.  Indeed, the conspiracy was inherently self-concealing, and

21  Defendants took affirmative steps to avoid detection of their conspiratorial conduct.  By way of

22  example, Defendants falsely represented that the pricing offered to Seagate was due to cost increases

23  or demand changes, deceiving Seagate into believing there were legitimate market reasons for the

24  prices it paid.  In reality, Defendants were not competing legally for Seagate's business but were

25  cheating Seagate on billions of dollars of Seagate's purchases by conspiring to coordinate their

26  activities to advantage themselves while overcharging and imposing artificially inflated prices while

27  also allocating market shares.

28

## II.     JURISDICTION

26.     Seagate brings this action to recover damages, including treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15(a)), costs of suit, and reasonable attorneys' fees arising from Defendants' price-fixing and market allocation in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1) as well as the state-law provisions and remedies identified below.

27.     This Court has subject matter jurisdiction over this action pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)) and 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental subject matter jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

28.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  This effect gives rise to Seagate's antitrust claims.  During the Conspiracy Period, the conspiracy directly and substantially affected the prices of suspension assemblies purchased by Seagate and others in the United States and around the world.

29.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22).   In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States as they conducted business and entered into contracts in the United States for the sale of suspension assemblies, manufactured suspension assemblies for sale in the United States and for incorporation into products for sale in the United States, and their conspiratorial conduct had a substantial effect on interstate and foreign trade and commerce in the United States.

## III.    VENUE

30.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Seagate's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.  Venue

1   is also proper in this District pursuant to mandatory venue clauses contained in nondisclosure

2   agreements between Seagate and each of the Defendants.

3       31.   On October 8, 2019, the Judicial Panel on Multidistrict Litigation ("JPML")

4   centralized several related actions pertaining to the conspiracy alleged herein in this District before

5   the Honorable Maxine M. Chesney, Senior U.S. District Judge, as *In re Hard Disk Drive Suspension*

6   *Assemblies Antitrust Litigation*, MDL. No. 2918.  The JPML recognized that Defendant Headway

7   Technologies, Inc. ("Headway") has its headquarters in this District and that third-party discovery

8   is expected to take place from two HDD manufacturers headquartered in this District.  This case is

9   related to the actions in MDL No. 2918.

10      32.   Intradistrict Assignment.  This action should be excluded from the Intradistrict

11  Assignment rules as detailed in N.D. Cal. L.R. 5-2(c) because it is related to MDL No. 2918, which

12  is an antitrust class action.

13  **IV.   PARTIES**

14      **A.   Seagate Plaintiffs**

15      33.   Plaintiff Seagate Technology LLC, a Delaware limited liability company, is a wholly

16  owned indirect subsidiary of Seagate Technology plc, with its principal place of business at 10200

17  South De Anza Boulevard, Cupertino, California 95014.  During the Conspiracy Period, Seagate

18  Technology LLC had primary responsibility for negotiating all of Seagate's purchases of suspension

19  assemblies during the relevant period and entered into agreements with the Defendants governing

20  these purchases, in addition to purchasing affected suspension assemblies directly from Defendants

21  at prices illegally fixed by Defendants.  Seagate Technology LLC was thus injured in its business

22  or property as a result of Defendants' anticompetitive and unlawful conduct.

23      34.   Plaintiff Seagate Technology (Thailand) Ltd., a Thai corporation, is a wholly owned

24  indirect subsidiary of Seagate Technology plc, with its executive office at 10200 South De Anza

25  Boulevard, Cupertino, California 95014, and its registered office and primary operational activities

26  at 1627 Moo 7 Teparuk Road, Tambol Teparuk, Amphur Muang, Samutprakarn 10270, Thailand.

27  During the Conspiracy Period, Seagate Thailand assisted Seagate Technology LLC at times with

28

Seagate's purchase of the affected suspension assemblies directly from certain Defendants at prices illegally fixed by Defendants, and was thus injured in its business or property as a result of Defendants' anticompetitive and unlawful conduct.

35.     Plaintiff Seagate Singapore International Headquarters Pte. Ltd., a Singapore company, is a wholly owned indirect subsidiary of Seagate Technology plc, with its principal place of business at 90 Woodlands Avenue 7, Singapore 737911, Singapore.   During the Conspiracy Period, Seagate Singapore assisted Seagate Technology LLC at times with Seagate's purchase of the affected suspension assemblies directly from certain Defendants at prices illegally fixed by Defendants, and was thus injured in its business or property as a result of Defendants' anticompetitive and unlawful conduct.

36.     Plaintiff Seagate Technology International, a Cayman Islands company, is a wholly owned indirect subsidiary of Seagate Technology plc, located at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands with its principal place of business in Grand Cayman, Cayman Islands.   During the Conspiracy Period, Seagate International assisted Seagate Technology LLC at times with Seagate's purchase of the affected suspension assemblies directly from certain Defendants at prices illegally fixed by Defendants, and was thus injured in its business or property as a result of Defendants' anticompetitive and unlawful conduct.

**B.     NHK Defendants**

37.     Defendant NHK Spring Co. Ltd. ("NHK Spring") is a Japanese corporation with its principal place of business located at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004, Japan. During the Conspiracy Period, NHK Spring manufactured, marketed, sold and/or distributed HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.   NHK Spring pled guilty on or about July 26, 2019, and admitted to its "high-level personnel" participating in a conspiracy "the primary purpose of which was to fix the prices of HDD suspension assemblies sold in the United States and elsewhere" and which "had a

1    direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce"

2    in the United States.

3         38.    Defendant NHK International Corporation ("NHK International") is a U.S.

4    subsidiary established by NHK Spring in or about October 1976, with its principal place of business

5    located at 46855 Magellan Drive, Novi, Michigan 48377.  During the Conspiracy Period, NHK

6    International supplied, serviced, and/or sold suspension assemblies, either directly or indirectly

7    through its subsidiaries or affiliates, to customers including in the United States.

8         39.    Defendant NHK Spring (Thailand) Co., Ltd. ("NHK Thailand") is a Thailand-based

9    subsidiary of NHK Spring, with its principal place of business located at Bangna Tower A, 6th-7th

10   floor 2/3 Moo 14, Bangna-Trad Rd., (km. 6.5), Bangkaew, Bangplee, Samutprakarn 10540

11   Thailand.  During the Conspiracy Period, NHK Thailand manufactured and supplied suspension

12   assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including

13   in the United States.

14        40.    Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT DongGuan") is a China-

15   based subsidiary of NHK Spring, with its principal place of business located at Conrad Hi-Tech

16   Park, Shangsha, ZhenAn Road, ChangAn Town, Dongguan, Guangdong, 523830 China.  During

17   the Conspiracy Period, NAT DongGuan manufactured and supplied suspension assemblies, either

18   directly or indirectly through its subsidiaries or affiliates, for Seagate and customers including in

19   the United States.

20        41.    Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a China-based

21   subsidiary wholly owned by NHK Spring, with its principal place of business located at Suite 15b-

22   17, 9/F, Tower 3, China Hong Kong City, 33 Canton Rd., T.S.T., Kowloon, Hong Kong.  NAT H.K.

23   was formed as a joint venture between NHK Spring and SAE Magnetics (H.K.) Ltd. (a subsidiary

24   of TDK Corporation) in or around 2004, and operated as such until 2015.  During this time, SAE

25   Magnetics had one seat on NAT H.K.'s board of directors and owned 19% of the venture; NHK

26   owned 81% of the venture.  During the Conspiracy Period, NAT H.K. manufactured and supplied

27

28

-9-

HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, for Seagate and customers including in the United States.

42.     NAT H.K. and NAT DongGuan are together referred to herein as "NAT."

43.     Defendants NHK Spring, NHK International, NHK Thailand, NAT DongGuan, and NAT H.K. are together referred to herein as "NHK."

**C.     TDK Defendants**

44.     Defendant TDK Corp. is a Japanese corporation with its principal place of business located at 2-5-1 Nihonbashi, Chuo-ku, Tokyo, 103-6128, Japan.  TDK Corp. has a California-based branch located at 1745 Technology Drive, Suite 200, San Jose, CA 95110.  High level personnel of TDK and its subsidiaries participated in the conspiracy.  During the Conspiracy Period, TDK Corp. manufactured, marketed and/or sold suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

45.     Defendant Magnecomp Precision Technology Public Co. Ltd. ("MPT") is a Thailand-based subsidiary of TDK Corp., with its principal place of business located at 162 M.5 Phaholyothin Road, T.Lamsai A.Wangnoi, Ayutthaya 13170, Thailand.  During the Conspiracy Period, MPT manufactured, marketed and/or sold suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

46.     Defendant SAE Magnetics (H.K.) Ltd. ("SAE Magnetics") is a China-based subsidiary wholly owned by TDK Corp., with its principal place of business located at 6 Science Park East Avenue, Hong Kong Science Park, Hong Kong, China.  During the Conspiracy Period, SAE Magnetics maintained an office in the United States and its top management held meetings in the United States with suspension assembly suppliers, including Seagate.  During the Conspiracy Period, SAE Magnetics manufactured and supplied HDD head gimbal assemblies ("HGAs") containing suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

47.     Defendant Headway Technologies, Inc. is a Delaware corporation wholly owned by TDK Corp., with its principal place of business located at 682 South Hillview Drive, Milpitas,

-10-

California 95035.  Headway provides recording head products to the HDD industry and employs approximately 800 people in engineering, manufacturing and administration roles in Milpitas, California.  Headway Technologies is the TDK-family entity that acquired Defendant Hutchinson Technology Inc. in 2016.

48.     Defendant Hutchinson Technology Inc. ("Hutchinson" or "HTI") is a Minnesota corporation that was acquired by Defendant Headway for TDK Corp. in 2016, with its principal place of business located at 40 West Highland Park Drive NE, Hutchinson, Minnesota 55350. During the Conspiracy Period, HTI manufactured, marketed and/or sold suspension assemblies in the United States and, either directly or indirectly through its subsidiaries or affiliates, to customers including in the United States.

49.     Defendants TDK Corp., MPT, SAE Magnetics, HTI, and Headway are together referred to herein as "TDK," except where HTI is called out individually.

**D.     Agents and Co-Conspirators**

50.     On information and belief, other persons, corporations, partnerships, or business entities not named as Defendants in this Complaint are co-conspirators with Defendants in their unlawful restraints of trade, and have performed acts and made statements in furtherance thereof. In particular, over three dozen individuals who were employed by one or more Defendant have been implicated in the anticompetitive conduct by government enforcement agencies.

51.     These other persons or entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to fix the prices of, and allocate market shares for, suspension assemblies.  Seagate reserves the right to name some or all of these persons or entities as Defendants at a later date.

**V.     SUSPENSION ASSEMBLY CONSPIRACY**

**A.     Hard Disk Drives**

52.     An HDD is a computer storage device that electronically stores data, such as documents, pictures, and operating systems, using magnetic recording heads to read and write to rapidly spinning disks.  HDDs can be internal or external, and are primarily used in four broad

-11-

segments:  desktop HDDs, mobile (laptop) HDDs, enterprise HDDs, and consumer electronics HDDs.

53.     HDDs comprise, among other things, magnetic disks, heads, and a motor.  A motor-driven spindle hub rotates the disks, each of which has data recorded electromagnetically in concentric circles, or tracks, on the disk.  A magnetic head, similar to a phonograph arm, reads or writes the information on the tracks.  Two heads, one on each side of a disk, read or write the data as the disk spins.

**Figure 1:  Physical Structure of Hard Disk Drive[5]**



### B.     Suspension Assemblies

54.     HDDs cannot read and write data without a suspension assembly.  Suspension assemblies serve the essential functions of (i) securing the read/write head in position over the disk, (ii) maintaining a constant height, and (iii) linking the read/write head to the electronic circuitry of the HDD.  Given their importance (and perhaps also due to this conspiracy), suspension assemblies are one of the *highest cost* components of an HDD (and for certain HDDs are the highest cost component).

55.     Suspension assemblies hold the recording heads in close proximity to the disks and provide the electrical connection from the recording heads to the HDDs' circuitry.  Suspension

---

[5] Sarah Felix et al., *Strain Sensing With Piezoelectric Zinc Oxide Thin Films for Vibration Suppression in Hard Disk Drives*, (Jan. 2008), *available at* https://www.researchgate.net/publication/242079742_Strain_Sensing_With_Piezoelectric_Zinc_Oxide_Thin_Films_for_Vibration_Suppression_in_Hard_Disk_Drives.

assemblies position the magnetic read/write head above the data on the surface of the spinning disks in the HDD.  The distance between the read/write head and the disk platter is referred to as "flying height."  The accuracy of this positioning over the tracks on the disk largely determines areal density and subsequently each disk's data capacity.

56.     A modern HDD's flying height is smaller than the circuit size of most modern microprocessors today.  In other words, the flying height is thinner than a finger print.  The suspension has a built-in actuator that holds the head within a very small tolerance of the centerline of the data track.  Thus, suspension assemblies are essential to the reliability and performance of HDDs.

**Figure 2:  HDD Suspension Assembly[6]**



### C.     Market Characteristics and Trends That Motivated and Facilitated the Conspiracy

57.     Suspension assemblies proved to be prone to successful price-fixing and market allocation during the Conspiracy Period.  Defendants exploited the industry and product factors

---

[6] Kazemi M.R., *Suspension Assembly for Hard Disk Drive* (2013), *in* Wang Q.J., Chung Y (eds) Encyclopedia of Tribology, *available at* https://link.springer.com/referenceworkentry/10.1007%2F978-0-387-92897-5_1140.

described below to achieve their anticompetitive purpose and conduct throughout the Conspiracy Period.

### i.   Substitutability

58.   It is easier to form and sustain a cartel when the products are substitutable because it is easier for conspirators to agree on prices to charge and to monitor those prices once an agreement is formed.

59.   While suspension assemblies require complex technical design per specific HDD projects, suspension assemblies are often interchangeable within an HDD project.

60.   Suspension assemblies produced by different manufacturers can often be freely substituted for one another once an HDD project is launched, rendering one brand essentially indistinguishable from any other.  Indeed, HDD manufacturers often utilize more than one brand of the same type of suspension assemblies interchangeably within the same HDD.

61.   As Defendants recognized prior to and throughout the Conspiracy Period, there was often substitutability of suspension assemblies among Defendants' products, rendering the market especially susceptible to maintaining the anticompetitive conduct.  Pricing is a primary differential between competitors and, accordingly, a principal basis upon which purchasing decisions on suspension assemblies are made.  Therefore, curtailing price competition, as Defendants did here, was an effective means of suppressing competition.

62.   Moreover, as a result of the substitutability of their product offerings and their frequent conspiratorial communications, Defendants were able to more readily agree on uniform prices and more easily detect any Defendant's failure to adhere to those prices.

### ii.   Market Concentration

63.   The suspension assembly industry was highly concentrated during the Conspiracy Period.  Defendants dominate the suspension assembly supply, holding a combined worldwide market share of approximately 90% as of 2016.

64.   The suspension assembly supply was competitive in the 1980s, but has since consolidated substantially and has become highly concentrated.  Additionally, there has been

-14-

increased vertical integration of HDD suppliers like TDK that formerly depended on independent component suppliers in their manufacturing of HDDs.

65.   For example, TDK acquired a formerly independent suspension assembly manufacturer in 2007 and had fully integrated that acquisition by 2009.  HTI, at one time the largest manufacturer of suspension assemblies, was also acquired by TDK in 2016 after being subjected to coordinated efforts by TDK and NHK to weaken its market position.  Prior to the acquisition, HTI had gone through its own process of consolidation and was a principal supplier of suspension assemblies to Seagate, Western Digital Corporation ("WD") (headquartered in San Jose, CA), and SAE Magnetics/TDK (Tokyo, Japan).  HTI's business is now consolidated within the TDK family.

66.   A highly concentrated industry is more susceptible to collusion and other anticompetitive practices.  Supplier consolidation for suspension assemblies has continued to the point where there are now only two major global suppliers, TDK and NHK, making collusion easier.  NHK acknowledged as much.  In 2015, in relation to the consolidation from three suppliers down to two due to TDK's acquisition of HTI, an NHK executive noted:  "I can't say it out loud, but this should make the price easier to control."

67.   No notable new manufacturers have entered the suspension assembly industry or effectively challenged Defendants, which are collectively dominant in the supply of suspension assemblies, since before the beginning of the Conspiracy Period.

### iii.   Barriers to Entry

68.   Under basic economic principles, a collusive arrangement that raises product prices above competitive levels may attract new entrants seeking to benefit from the supracompetitive pricing.  However, where there are significant barriers to entry, new entrants are much less likely to enter.  Thus, barriers to entry help facilitate the formation and maintenance of cartels.

69.   There are substantial barriers to entry in the suspension assembly industry that would require substantial time, resources, and industry knowledge to even potentially overcome.  This is particularly true here where manufacturing suspension assemblies requires the ability to produce precision assemblies in large volumes.  As Defendant HTI conceded, "We believe that the number

-15-

of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."[7]

70.     Defendants also collectively own the majority of patents for suspension assemblies, placing a significant and costly burden on potential new entrants which must avoid infringing Defendants' patents when entering with a new product.

71.     Entry is thus unlikely in the supply of suspension assemblies, which further facilitates collusion and reinforces industry concentration as discussed above.   And because suspension assemblies are a fundamental and necessary component of HDDs, these factors meant that Seagate had no meaningful ability to choose alternative suppliers to Defendants, which rendered price competition between the suppliers the only way to ensure that Seagate paid a competitive price.

### iv.     Inelastic Demand

72.     Demand inelasticity for suspension assemblies further facilitated the conspiracy, allowing Defendants to raise prices to supracompetitive prices without significantly undermining sales volumes.   Demand inelasticity means that price variations do not significantly impact sales volumes.   This phenomenon is experienced when a product has an important function, but has few or no practical substitutes.   It facilitates collusion by ensuring the conspiracy will not fall apart due to purchasers reducing their purchases of the price-fixed goods.

### D.     Direct Evidence of the Conspiracy

73.     There is ample direct evidence of the suspension assembly conspiracy.   Indeed, direct evidence establishes the existence of the conspiracy and participation by all three Defendants—HTI, NHK, and TDK (as noted, TDK acquired HTI in 2016).   The allegations herein reflect direct evidence and admissions secured by enforcement agencies around the world and from documents or other information obtained from Defendants.

---

[7] William McConnell, *Hutchinson Shares Extend Slide on Continued FTC Antitrust Review*, THESTREET (Jan. 5, 2016), *available at* https://www.thestreet.com/story/13412469/1/hutchinson-shares-keep-falling-on-extended-ftc-antitrust-review.html.

74.     In April 2018, CADE reported that the conspiratorial conduct began as early as 2003 and continued until at least 2016.[8]  According to CADE, *all three Defendants*—HTI, NHK, and TDK—and certain of their subsidiaries, including Magnecomp Precision Technology Public Co. Ltd, SAE Magnetics (H.K.) Ltd., and NHK Spring Co., Ltd., participated in the conspiratorial conduct, along with 38 individuals from the Defendants.  Indeed, CADE reported that "five companies and thirty-eight individuals would have *participated* in the collusion."[9]  The individuals identified included high-level sales and executive management personnel from the Defendants.

75.     CADE reported that it has "compelling evidence of the perpetration of antitrust conduct consisting of (i) [p]rice fixing in response to customer quotation orders; (ii) [m]arket division and (iii) [s]haring of commercial and competitively sensitive information."  This conspiratorial conduct was "rendered feasible by way of meetings and bilateral exchanges of emails."[10]

76.     CADE's analysis noted "there were various exchanges of sensitive information between the competitors of the global market of suspension assemblies . . . . Sharing of commercial and competitively sensitive information included but was not limited to information on (iii.1) *[c]urrent, potential and proposed prices*, for suspension assemblies, (iii.2) *[p]rivate customer bidding processes*, (iii.3) [a]llocation of customer volumes, (iii.4) [m]anufacturing capacity of each company, and (iii.5) [u]ser fees for each company, for the purposes of stabilizing prices and reducing competition in sales of suspension assemblies."[11]

77.     Based on the existence of such "strong evidence," CADE found that "this exchange of commercially sensitive information rendered the establishment of strategic long-term relations feasible between the competitors, based on the elimination or softening of the price war or price

---

[8] Administrative Council for Economic Defense, Technical Report No. 4/2018 of the General Superintendent's Office (SEI No. 0459666) ¶ 4 ("CADE Report").

[9] Press Release, CADE's General Superintendence Probes Cartel in the Global Market for Hard Disk Components (Apr. 26, 2018), *available at* http://en.cade.gov.br/cades-general-superintendence-probes-cartel-in-the-global-market-for-hard-disk-components-1.

[10] CADE Report ¶¶ 5, 6 (emphasis omitted).

[11] *Id.* ¶ 27 (emphasis added and omitted); *see also id.* ¶ 5.

-17-

1    competition, which meant avoiding aggressive price competition in private bidding processes and

2    quotations, and in the division of the world market of suspension assemblies."[12]

3          78.    Exchange of pricing and production strategy information "may favor collusion to the

4    extent that companies better coordinate" their prices and production conditions.  CADE noted that

5    *in this case*, the information was not public and the exchanges occurred directly between competitors

6    and "exercised a direct influence on the strategies adopted by the companies participating in the

7    Cartel."[13]

8          79.    These exchanges "included recent, current and future data, not shared within other

9    circles, with a view to permitting the companies to align their operations within the market based

10   on the commercially sensitive information shared."[14]  To accomplish this, the Defendants provided

11   highly detailed information.[15]

12         80.    CADE concluded that it had uncovered "robust evidence of violations" of the

13   competition laws in Brazil.[16]

14         81.    In the United States, the DOJ similarly found that the evidence showed the

15   "conspiracy consisted of a continuing agreement, understanding, and concert of action . . . to refrain

16   from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD

17   suspension assemblies to be sold in the United States and elsewhere."[17]

18         82.    The DOJ further concluded that NHK and its co-conspirators, through their officers

19   and employees, including high-level personnel, participated in the illegal conduct.  On information

20   and belief, the co-conspirators included TDK and HTI.

21         83.    The DOJ determined that NHK and its co-conspirators engaged in the following

22   activities for the purpose of forming and carrying out the conspiracy:

23

24   _____

25   [12] *Id.* ¶ 28 (emphasis omitted).
     [13] *Id.* ¶ 29.
26   [14] *Id.* ¶ 30 (emphasis omitted).
     [15] *Id.* (emphasis omitted).
27   [16] *Id.* ¶ 37.
     [17] Information, United States of America v. NHK Spring Co., Ltd, 2:19-cr20503, ¶7 (E.D. Mich. Jul. 29, 2019), ECF
28   No. 1.

    a.  discussions and meetings in the United States and elsewhere, during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies sold in the United States and elsewhere;

    b.  exchanging HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere, as a means of implementing the agreement not to compete;

    c.  relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced HDDs for sale in, or delivery to, the United States and elsewhere;

    d.  selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere for incorporation into products sold into the United States at collusive and noncompetitive prices; and

    e.  accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.[18]

84.    NHK *admitted* to participating in the conspiratorial conduct described in the preceding paragraph as part of its plea agreement with DOJ entered on July 26, 2019, under which NHK further agreed to pay a fine.[19]  On September 23, 2019, the District Court for the Eastern District of Michigan accepted NHK's guilty plea.

85.    NHK *admitted* to engaging in this conduct from at least as early as May 2008 and continuing until at least April 2016.  Notably, the relevant conspiracy period was limited to those dates "[f]or purpose of this Plea Agreement" only.[20]

---

[18] *Id.* ¶ 8.
[19] See Press Release, Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drive, (July 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.
[20] Rule 11 Plea Agreement ¶ 4(a), United States v. NHK Spring Co. Ltd., No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019), ECF No. 15 ("Plea Agreement").

86.     NHK further *admitted* as part of the plea agreement that an unnamed Company A also participated in a conspiracy which had the primary purpose of fixing the prices of HDD suspension assemblies sold in the United States and elsewhere.  NHK also admitted that Company A participated in the aforementioned activities for the purpose of forming and carrying out this conspiracy.  NHK further admitted that Company A, through its officers and employees, reached agreements with NHK to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies sold in the United States and elsewhere.[21]

87.     On information and belief, Company A described in NHK's plea agreement with DOJ is TDK.  Due to industry consolidation as described herein, including TDK's acquisition of HTI, there are now only two major global suppliers of suspension assemblies:  TDK and NHK.  Moreover, the JFTC issued a cease and desist order in 2018 describing an agreement "to fix the selling prices of suspensions" between those two remaining global suppliers:  NHK and TDK.[22]

88.     On February 13, 2020, DOJ filed an indictment in the United States District Court for the Northern District of California against Hiroyuki Tamura and Hitoshi Hashimoto, two former NHK executives involved in the sale and pricing of NHK's suspension assemblies.  Hiroyuki Tamura was the general manager of NHK Spring's disk drive suspension and component sales department from approximately 2007 through April 2013.  Hitoshi Hashimoto held the same position from April 2013 through April 2016.[23]  During the Conspiracy Period, Mr. Hashimoto also held a position at NAT.

89.     According to the indictment, the DOJ determined that Tamura, Hashimoto, and their co-conspirators engaged in the following activities:

> a.    attending meetings and engaging in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

---

[21] *Id.* ¶ 4(c).
[22] Japan Fair Trade Commission, Year 2018 (Measure) No. 5, Cease and Desist Order ¶ 1 (Feb. 9, 2018) ("JFTC Cease and Desist Order").
[23] Indictment, United States of America v. Hitoshi Hashimoto and Hiroyuki Tamura, 3:20-cr-00070-JD, ¶2-4 (N.D. Cal. Feb. 13, 2020), ECF No. 1.

-20-

b.  agreeing during those meetings and communications to refrain from competing on prices for and stabilize, maintain, and fix the prices of HDD suspension assemblies to be sold in the United States and elsewhere;

c.  agreeing during those meetings and communications to allocate their respective market shares for HDD suspension assemblies to be sold in the United States or elsewhere;

d.  discussing and exchanging HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

e.  communicating with sales employees in the United States and elsewhere and directing those employees to exchange HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

f.  relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere;

g.  selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices; and

h.  accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.

90.     HTI also was a knowing participant in the conspiratorial conduct.  As stated by CADE, HTI was one of the entities that "demonstrated some degree of participation" in the conduct.[24]

91.     On information and belief, TDK admitted to engaging in price-fixing with NHK as part of its leniency applications to government agencies.  On May 6, 2016, TDK applied for leniency

---

[24] CADE Report ¶ 4.

with the JFTC.[25]  In July 2016, the JFTC raided Defendant NHK and Defendant TDK (or certain of their subsidiaries) based on suspected coordinated price-fixing activity by the two companies.  On February 9, 2018, the JFTC issued a cease and desist order to NHK and fined NHK, finding that NHK and TDK substantially restrained competition in the suspension assembly market by agreeing to maintain sale prices.[26]  By that point in time, TDK had acquired HTI.

92.     The JFTC similarly concluded that at least TDK, NHK Spring Co. Ltd., and NAT Peripheral (H.K.) Co. substantially restrained competition in the suspension assembly market by agreeing to maintain sales prices.  The JFTC found that TDK and NHK coordinated with each other and agreed to fix prices of suspension assemblies "to secure the[ir] market share and profits," including by holding multiple meetings with sales managers between August 31, 2007 and January 28, 2009 to confirm their price-fixing strategy.[27]

93.     The JFTC further concluded that in order to implement the conspiratorial agreement, TDK and NHK would confirm the quoted prices and selling prices for Requests for Quotations ("RFQs") and "exchang[e] information on suspension demand forecasts and selling prices as well as the quoted prices presented when foreign HDD manufacturer-sellers issued RFQs."[28]  Again the JFTC explained that these information exchanges occurred in sales manager meetings.

94.     In sum, in order to raise, stabilize and/or slow the decline of prices of suspension assemblies sold to Seagate, Defendants TDK, NHK and HTI conspired to suppress and eliminate competition for suspension assembly sales by fixing prices, exchanging bidding information, agreeing on bids, and allocating their sales.

95.     Defendants TDK and NHK have admitted to the existence of this conspiracy in leniency applications and a guilty plea, respectively.  These admissions constitute direct evidence of the alleged conspiracy.

---

[25] JFTC Cease and Desist Order to the Manufacturers of Suspension for Hard Disk Drives (Feb. 9, 2018), available at https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1_files/201802betten.pdf (working translation).
[26] JFTC Press Release (Feb. 9, 2018), *available at* https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1.html.
[27] JFTC Cease and Desist Order ¶ 2.
[28] *Id.* ¶ 3.

1     **E.     Carrying Out the Conspiracy[29]**

2     96.     During the Conspiracy Period, Defendants conspired to suppress and eliminate

3  competition for suspension assembly sales by fixing prices, exchanging bidding information,

4  agreeing on bids, sharing Seagate confidential information, and allocating their sales, in order to

5  raise, stabilize, and/or slow the decline of prices of suspension assemblies sold to Seagate.

6     97.     NHK and MPT had contacts through multiple channels to exchange competitively

7  sensitive information and coordinate with regards to the manufacture and sale of suspension

8  assemblies.  The exchange of competitively sensitive information included:  (i) actual, potential,

9  and proposed prices; (ii) market shares and customer volumes; (iii) manufacturing capacities; (iv)

10 utilization rates; (v) timing of bid responses and other general bid information; and (vi) information

11 related to product design and development.

12    98.     These communications were carried out between personnel at various levels of

13 Defendants' corporate families—including high-level executives, sales managers, and individuals

14 with pricing authority—based in various geographic locations, including Minnesota, California, and

15 other U.S. states, Japan, Thailand, and Hong Kong.

16    99.     At least one purpose of the conspiracy between TDK and NHK was to eliminate or

17 ease any price war or price competition between TDK and NHK on sales of suspension assemblies

18 to Seagate.  The purpose of at least some of the communications between NHK and TDK in

19 furtherance of their conspiracy was to keep prices for suspension assemblies they sold to Seagate

20 higher than they otherwise would have been.

21    100.    Contact between and among Defendants MPT, NHK, and HTI in the United States,

22 including in California and Minnesota, began as early as 2001.

23    101.    From at least 2001 until 2008, MPT's Director of Sales and Account Management

24 had contacts with competing suppliers of suspension assemblies.  During at least part of this time,

25 this MPT Director was responsible for sales to Seagate.  These exchanges included discussions of

---

27 [29] Many allegations herein reflect information Seagate obtained from Defendants' own documents produced during
this litigation.

competitively sensitive information including prices, capacities, and plans for customer programs. As an example, the MPT Director's contacts with NHK resulted in MPT receiving information on prices and capacity for certain Seagate programs.  During this period the MPT Director was based in Minnesota.  Many of these communications involved NHK International's California-based VP of Disk Drive Suspension and Component Sales, who had responsibility for U.S. sales, including NHK's sales to Seagate.

102.   In addition to his contacts with NHK, the MPT Director exchanged competitive information with HTI, where he was previously employed, between at least 2001/2002 and 2008. In one August 2005 email, the MPT Director referenced contacting old friends from HTI to see if they were getting the same demands from Seagate regarding Seagate's Alpine project.  These old friends included HTI's Director of Strategic Business Unit Sales and Marketing, based in Minnesota, as well as two of HTI's Seagate sales representatives.

103.   For instance, in one March 2007 email, the MPT Director told several senior MPT executives and sales managers, including his superiors, that he would check with the HTI sales representatives for Seagate about prior prices HTI had offered on Seagate's Argon and Cadmium programs.

104.   In one December 2006 email, the MPT Director received pricing information for Seagate's Argon and Cadmium programs from HTI, which he conveyed to senior executives and sales managers at MPT.

105.   During this period, MPT also facilitated communications between NHK and HTI, including contacts in which all three Defendants participated.  Several of these communications occurred in-person in California.

106.   The MPT Director introduced the HTI Director to the NHK VP of Sales in the early 2000s during a business trip to California.  After that, the HTI Director and the NHK VP of Sales went to a hunting lodge in the United States every year between 2003 and 2012, during which time they had at least one discussion that touched on prices.

-24-

107.    Other MPT employees also exchanged competitive information with NHK during the early 2000s.  From at least 2005 until 2008, MPT's Senior Director of Sales and Account Management responsible for sales to WD communicated with the NHK VP of Sales at least quarterly about topics including suspension assembly customers, shipment volumes, and prices.  The MPT Senior Director had a good relationship with the NHK VP of Sales because they worked together previously and had known each other for many years.

108.    The MPT Senior Director relayed information learned from these conversations to senior executives and sales managers at MPT.

109.    The MPT Senior Director often reached out to the NHK VP of Sales at the specific behest of his superiors.

110.    Though the MPT Senior Director was in charge of sales to WD and often exchanged information with NHK about WD specifically, he also received information about other customers, including pricing and volume information about Seagate.  For example, in a May 2008 email, he shared a detailed recap of a discussion he had with NHK, which included NHK's sales volumes for Seagate.

111.    The MPT Senior Director and NHK at times reached agreements on prices.  In one August 2008 email, the MPT Senior Director recapped a conversation with NHK, indicating that he and NHK came to an understanding on pricing for WD's Mercury program.

112.    In 2008, the MPT Director and the MPT Senior Director left MPT during a round of large company layoffs.  Following their departure, their immediate superior, the VP of Sales and Account Management for MPT took over their responsibilities.  The MPT VP of Sales also began to play a more direct role in communications with the NHK VP of Sales.

113.    From at least 2008 until April 2016, the MPT VP of Sales communicated with the NHK VP of Sales via emails, text messages, and in-person meetings at least once per month and more frequently when customers issued requests for quotations on specific products.  They discussed topics such as prices, new product designs, actual and forecasted shipments, capacity,

-25-

utilization, and bids.  One purpose of their discussions was to avoid price decreases.  Sometimes MPT used NHK to check price information it had received from a customer.

114.    The MPT VP of Sales also communicated directly with executives and sales people from numerous NHK subsidiaries.  For example, he had multiple contacts with NHK Thailand's General Manager for HDD Sales, including conversations in which they discussed prices that would be quoted to customers.  The NHK General Manager then relayed this information with employees of NHK Thailand's parent and sister companies.

115.    The MPT VP of Sales also shared information he learned from the NHK VP of Sales directly with his superior, a senior MPT executive.  In turn, the senior MPT executive shared information he received from his own communications with senior executives and sales managers at NHK.

116.    Both prior to and following TDK's acquisition of MPT in 2007, the senior MPT executive also had contacts with various individuals at NHK, including Hiroyuki Tamura, Senior Sales Director for NHK's Disk Drive Suspension and Component Sales Division from 2007 through 2013, and Hitoshi Hashimoto, who took over the same role in 2013.

117.    Both Mr. Tamura and Mr. Hashimoto were indicted by the Department of Justice in February 2020.  The senior MPT executive's contacts with NHK involved exchanges of competitively sensitive information including customers, bids, capacity, utilization, technology, actual and potential bid prices, and component supplier issues.

118.    The pricing information that MPT received from NHK, including Seagate's confidential information, allowed MPT to set baseline prices, avoid pricing too low, and avoid "overshooting the market" because customers were trying to drive prices down.  The discussion allowed the companies not to "go crazy on prices" and to abstain from starting a price war.  The purpose of the conversations was to keep prices higher than they otherwise would have been.

119.    As early as 2003, the senior MPT executive and Mr. Tamura began communicating while negotiating a cross-licensing agreement between the companies.  Thereafter,  the senior MPT

-26-

executive began meeting with Mr. Tamura and other individuals to exchange information about suspension assemblies.

120.     Between 2005 and 2007, the senior MPT executive and Mr. Tamura met one or two times a year; their communications included discussions of prices, volumes, actual and projected shipments, customers, and component supplies.  After 2007 through 2013, they met four or five times per year, and more frequently around significant RFQs.

121.     As an example, in a December 5, 2005 meeting between the senior MPT executive and Mr. Tamura, the parties discussed Seagate and WD, among other topics.  During the meeting, NHK identified NHK's "starting price" for suspension assemblies to WD and confirmed that it was on Seagate's Titanium Program.  The senior MPT executive reported that he hoped to get indications of pricing from NHK.

122.     In another meeting in late 2005, the senior MPT executive and the U.S.-based MPT VP of Sales met with Mr. Tamura and an NHK executive at a Hawaiian coffee shop in Tokyo.  They discussed NHK's plan to build a suspension assembly facility in Thailand, which would add capacity and create an NHK presence in Thailand.  NHK assured the senior MPT executive that NHK would maintain its friendly relationship with MPT and not take market share away from them.

123.     Following TDK's acquisition of MPT in 2007, senior executives and sales managers from TDK and NHK met in Yokohama, Japan to discuss TDK's future plans for MPT and the suspension assembly business.  TDK assured NHK that the acquisition would not affect TDK and NHK's positive relationship.  The companies agreed to work together to grow both companies' market shares at the expense of their co-conspirator, HTI.  TDK and NHK further agreed to avoid a price war when they were trying to grow share at the expense of their co-conspirator, HTI.

124.     Thereafter, TDK and NHK senior executives and sales managers met at least quarterly.  During these meetings TDK and NHK discussed topics including specific customer bids or RFPs, information on capacity, utilization, customers, future expansion plans, and potential ways to lower suspension assembly production costs, including Seagate's confidential information.  The companies sometimes discussed their mutual desire to avoid a price war.

-27-

125.   Several of the NHK employees involved in contacts with TDK, including Mr. Hashimoto, held dual roles at NHK and NAT (NHK's joint venture with SAE Magnetics) and exchanged competitively sensitive information while acting in both capacities to facilitate the agreed conspiracy.

126.   In several such meetings that took place between August 2007 through at least January 2009, senior executives and sales managers of NHK, NAT, and TDK agreed on a long-term strategy for the companies' relationship.

127.   TDK and NHK agreed (i) to eliminate or ease any price war or price competition; and (ii) to work together to obtain market share from their co-conspirator, HTI.

128.   TDK and NHK also agreed to a rough overall market share of 40-40-20, wherein NHK would have 40% of the market, TDK would have 40% of the market, and HTI would have 20% of the market.

129.   TDK and NHK agreed to exchange competitively sensitive information, including Seagate confidential information, as a means to continue their conspiracy and achieve this 40-40-20 market allocation.

130.   TDK communicated this plan to SAE Magnetics and MPT.  All five companies—TDK, SAE Magnetics, MPT, NHK, and NAT—then worked together to share information, including information related to price and market share, to implement the agreed conspiracy.

131.   In addition to quarterly executive meetings, executives and sales managers from TDK and NHK met on other occasions from at least 2007 through 2014 to reaffirm their friendly relationship, including parties, New Year's events, and farewell and welcome dinners.

**F.      Defendants TDK and NHK Further Conspire to Wound and then Eliminate Their Co-Conspirator, Defendant HTI**

132.   In or around 2007, Defendants TDK and NHK started discussing how to profit more from their price-fixing conspiracy.  As part of these discussions, Defendants TDK and NHK started plotting against their fellow co-conspirator, HTI.  TDK and NHK began to view their co-conspirator HTI as a common threat, forming a conspiracy within a conspiracy to harm HTI.

-28-

133.   In an August 2007 meeting among senior executives, Defendants TDK and NHK agreed to "get more share from HTI together," as a way to profit more from their conspiracy.

134.   In this August 2007 meeting, Defendants TDK/MPT and NHK further agreed to avoid a price war with one another and to collectively take market share from HTI.

135.   In June 2009, Defendants TDK/MPT and NHK continued to plot against their co-conspirator HTI.  NHK's Hitoshi Hashimoto, who was subsequently indicted by DOJ for his role in the conspiracy, spoke with TDK's President and CEO and agreed that "TDK and NHK should focus to kick out HTI ASAP."

136.   For several years thereafter, Defendants TDK/MPT and NHK continued to conspire on ways to "kick out" HTI.  TDK/MPT and NHK secretly plotted for years to gain market share from their co-conspirator HTI and allocate the additional share between them, all while maintaining supracompetitive pricing to Seagate and others.

137.   On January 4, 2014, TDK Corp.'s President and CEO met with NHK senior executives to continue these discussions about their co-conspirator HTI.  In reporting on the meeting, NHK observed "[s]omething needs to be done under mutual cooperation" to better control their co-conspirator HTI.

138.   The discussions among Defendants TDK and NHK about HTI culminated in a plan for TDK to acquire HTI.  TDK and NHK agreed that TDK would acquire HTI in or around July 2014.

        a.   On June 12, 2014, the president of TDK and a sales director at NHK had a telephone conversation to discuss HTI's "financial situation."

        b.   In a June 26, 2014 meeting between TDK and NHK, the companies agreed with regard to "Company H" to continue "setting opportunities for discussion at both sides and making preparations for future."

        c.   On July 22, 2014, senior executives from TDK and NHK met to discuss a potential acquisition of HTI.  The companies agreed that TDK would acquire HTI to prevent an HDD manufacturer from acquiring and vertically integrating

-29-

HTI.  TDK confirmed that an acquisition of HTI would be "OK for NHK," and NHK responded, "Please go ahead […] we feel comfortable of [sic] 40% share." The companies also agreed that that NHK would buy out SAE Magnetics' share of NAT, a joint venture between SAE Magnetics and NHK, in order to facilitate antitrust clearance of TDK's acquisition of HTI.

139.    NHK bought out SAE Magnetics' share of NAT and subsumed NAT as a wholly-owned subsidiary in April 2015.

140.    TDK then announced its intention to acquire HTI on or about November 2, 2015.

141.    On or about one day later, an NHK Senior Manager reported that he had received TDK's legal strategy to obtain antitrust clearance from a "local source."  He later wrote:  "I can't say it out loud, but this should make the price easier to control."

142.    Prior to closing the transaction, TDK/MPT provided updates to NHK on the status of the HTI acquisition and discussed opportunities for the companies to collaborate post-merger.

143.    TDK selected its subsidiary Headway to be the acquiring entity.

144.    Headway was based in the United States (California), which provided certain regulatory benefits to TDK.

145.    TDK used four of its senior executives to carry out the scheme to eliminate HTI through Headway.  These four senior executives held dual positions within (at least) TDK Corp. and Headway during the time of the acquisition.  TDK placed two of these executives into roles at Headway leading to the acquisition announcement.

146.    TDK's placement of these senior executives within Headway allowed TDK to oversee and direct the acquisition.

147.    One of the senior executives was the President and CEO of Defendant TDK Corp., who acted as the Executive Vice President of Defendant Headway at the time of acquisition.  This executive had regular discussions with NHK about the acquisition of Defendant HTI, including with Mr. Hashimoto of NHK, who was indicted by the DOJ for the conspiracy.

148.   A second senior executive was the President of Defendant MPT, who also served as the President of Hydra Merger Sub, the Headway subsidiary that effectuated the acquisition of Defendant HTI.  In the time between the announcement of the HTI merger and its closing, this senior executive was appointed a TDK corporate officer.  This senior executive regularly participated in meetings and communications with NHK about their co-conspirator HTI.

149.   A third senior executive was the President of Defendant SAE Magnetics, who was a Director of Defendant Headway at the time of the HTI acquisition.  This senior executive had discussions with NHK about how the Defendants could "kick out" HTI.  Prior to closing, his direct report, a Senior VP at SAE Magnetics, met with NHK in California to discuss the status of the acquisition.

150.   A fourth senior executive was a Senior Vice President of Defendant TDK Corp., who was also a Director of Defendant Headway at the time of the HTI acquisition.  This senior executive regularly participated in conspiratorial meetings with NHK.

151.   Headway's acquisition of HTI was intended to guarantee the continued success of the long-running conspiracy.  The acquisition was intended to make it easier for the remaining co-conspirators to carry out and police their price-fixing and market allocation scheme.  The remaining conspirators needed only to consult with each other when determining who should bid and at what price.

152.   With this conspiratorial purpose in mind and during the Conspiracy Period, Headway entered an agreement to acquire HTI on or about November 1, 2015.  The acquisition was completed on or about October 6, 2016.

### G.   The Conspiracy Was Implemented in Significant Part and Had Significant Effects in Minnesota

153.   Defendants implemented the suspension assembly conspiracy described in the preceding paragraphs in significant part in Minnesota.

154.   Defendants implemented their conspiracy in Minnesota by, *inter alia*, (i) conducting "rigged" supply negotiations with Seagate in Minnesota, (ii) quoting price-fixed prices of

-31-

suspension assemblies to Seagate in Minnesota, (iii) supplying price-fixed suspension assemblies to Seagate in Minnesota, (iii) engaging in conspiratorial communications in and from Minnesota, and (iv) as related to Defendants TDK and NHK, scheming to wound and then eliminating their Minnesota-based co-conspirator, HTI.

155.    Seagate's offices in Minnesota (specifically in Bloomington, Minnesota) were home to Seagate's Commodities Management Team ("CMT") for much of the Conspiracy Period.  CMT holds, and held for much of the Conspiracy Period, primary responsibility for many aspects of procuring suspension assemblies along with employees in Seagate's California office, including negotiating the pricing for and overseeing the acquisition of suspension assemblies, designing engineering specifications for the suspension assemblies (with Seagate engineering based in Minnesota), and overseeing the supply and quality of suspension assemblies delivered to Seagate.

156.    Given Seagate CMT's presence in Minnesota and broad acquisition responsibilities, Defendants regularly traveled to or within Minnesota to negotiate in person with members of Seagate's team for Seagate's purchase of suspension assemblies during the Conspiracy Period. Defendants also regularly communicated over the telephone and electronic means with Seagate's CMT in Minnesota to negotiate Seagate's purchase of suspension assemblies during the Conspiracy Period.

157.    During negotiations with Seagate in Minnesota, Defendants proposed prices, pricing terms, and other supply terms to Seagate, including prices and pricing terms affected by the conspiracy.

158.    After proposing and negotiating prices, pricing, and supply terms with Seagate in Minnesota, Defendants shipped certain suspension assemblies directly to Seagate's offices in Minnesota.

159.    After proposing and negotiating pricing and supply terms with Seagate in Minnesota, Defendants shipped certain suspension assemblies to Seagate's offices outside of Minnesota for incorporation into hard disk drives delivered to Minnesota.

-32-

160.     Defendants supplied suspension assemblies to Seagate in Minnesota and for incorporation for hard disk drives delivered to Minnesota on a regular basis every year since at least 2003, the beginning of the Conspiracy Period.

161.     In part to facilitate the supply of suspension assemblies in Minnesota, all three Defendant suppliers of suspension assemblies—HTI, NHK, and TDK/MPT—maintained a presence in Minnesota during much of the Conspiracy Period.

162.     Defendant HTI was headquartered in Minnesota throughout the Conspiracy Period, until eliminated by Defendant TDK in 2016.  Defendant HTI employed thousands of employees in Minnesota during the Conspiracy Period, and manufactured and sold suspension assemblies in Minnesota.  HTI's disk drive products were sold principally through HTI's account management team operating primarily from its headquarter offices in Minnesota, and HTI employees met regularly in Minnesota with representatives of Seagate to negotiate supply.  HTI conducted hundreds of millions of dollars in business involving suspension assemblies from Minnesota during the Conspiracy Period.

163.     Defendant NHK maintained office space and employees in Minnesota to provide support to Seagate accounts, and regularly—at times, monthly—sent employees from Japan to Minnesota to meet with Seagate regarding the suspension assemblies NHK was selling and supplying to Seagate.

164.     Defendant TDK/MPT also based salespeople responsible for Seagate accounts in Minnesota during the conspiracy period, and regularly sent employees from Japan to Minnesota to meet with Seagate regarding the suspension assemblies TDK/MPT was selling and supplying to Seagate.

165.     Defendants' employees based in Minnesota also engaged in conspiratorial communications in or from Minnesota to carry out the conspiracy.  As examples only:

        a.  Defendant TDK/MPT deployed its Minnesota-based Director of Sales and Account Management for Seagate to participate in anticompetitive communications and agreements.  This Director of Sales was tasked by senior

-33-

MPT (and later TDK) executives to collect information from competitors; participated in information exchanges with competitors, including NHK and HTI; and fixed prices with competitors at the request of MPT executives. Top-level MPT executives funneled confidential business information learned through competitor communications to this Director of Sales in Minnesota.

b. Defendant HTI's Director based in Hutchinson, Minnesota maintained competitor contacts for years, including phone calls and annual hunting trips with the NHK VP of Sales, a key conspiracy participant from NHK, in which they shared information about the suspension assembly market and projected business information. At least two other Minnesota-based HTI employees exchanged competitive information with a Minnesota-based salesperson for Defendant MPT during the conspiracy period.

166.     Defendant TDK and Defendant NHK further implemented their conspiracy within a conspiracy in Minnesota by scheming to acquire their co-conspirator Defendant HTI, which was based in Minnesota. After TDK and NHK decided to weaken HTI, TDK, through Headway, formed a Minnesota-based subsidiary to acquire HTI: Hydra Merger Sub. TDK appointed the President of Defendant MPT to manage this Headway subsidiary in Minnesota and acquire HTI. This senior executive regularly participated in conspiratorial meetings and communications with NHK.

167.     Moreover, all three Defendant suppliers of suspension assemblies—HTI, NHK, and TDK/MPT—frequently shared confidential information about their price negotiations (with Seagate's Minnesota-based CMT) with one another, and on several occasions agreed on prices that they would quote to Seagate's CMT. As illustrative but not exhaustive examples:

a. In December 2010, NHK and MPT discussed pricing negotiations with a Minnesota-based member of Seagate's CMT. An NHK manager reported that NHK "should be tight with [MPT] for next submittal" to Seagate and would "continue dialogue [with MPT executives] for further price curve revision."

-34-

b.  In November 2011, an MPT executive sent notes from a meeting with a Minnesota-based members of Seagate's CMT to the president of SAE Magnetics with a recommendation that SAE Magnetics increase its prices to Seagate.

c.  In October 2013, another NHK salesperson reported that an MPT executive "is showing me their quotation" while he negotiated with a Minnesota-based member of Seagate's CMT.

**H.    Indirect Evidence of the Conspiracy**

168.    Indirect evidence also establishes the existence of the suspension assembly conspiracy and participation by all three Defendant groups—HTI, NHK, and TDK.

169.    The prices of suspension assemblies were declining in the early 2000s.  Defendants therefore had a motive to conspire, and in a concentrated industry with frequent contacts between competitors, had extensive opportunities to do so.

170.    In a competitive market, each Defendant would have had incentive to make increasingly competitive bids.  Yet throughout the Conspiracy Period, Defendants engaged in coordinated pricing patterns.  In particular, in response to Seagate's various requests for bids, each of the three suppliers from which Seagate purchased (HTI, NHK, and MPT) would set prices for different types of HDD suspension assemblies in a way that maintained the agreed upon share allocation.

171.    The three suppliers typically justified their respective prices based on costs and other normal market factors, thus deceiving Seagate as to the reasons for their bidding patterns.  Such actions against economic interest, amplified by the knowledge gained through the global investigations, constitute indirect evidence of the conspiracy in addition to the extensive direct admissions cited above.  The Defendants did not inform Seagate they were in fact conspiring against Seagate.

172.    In sum, during the Conspiracy Period, Defendants entered into agreements with each other and exchanged Seagate information among themselves to refrain from price competition and allocate their respective market shares for suspension assemblies.  Pursuant to their agreements not

-35-

to compete, Defendants exchanged pricing information, including anticipated pricing quotes, which they used to inform their negotiations with U.S. and foreign customers that purchased suspension assemblies and produced HDDs for sale in, or delivery to, the United States and elsewhere.  As a result of these agreements, Defendants charged Seagate artificially high prices for suspension assemblies.

173.    As a result of the conspiracy, the three suspension assembly suppliers charged supracompetitive prices on suspension assemblies supplied in the United States and supplied outside the United States for incorporation into products sold or supplied in the United States.

174.    The conspiracy was knowingly formed and was in existence from as early as 2003 through at least April 2016 with the effects continuing thereafter; the Defendants knowingly joined and participated in the conspiracy; and as a direct and proximate result of the Defendants' unlawful conduct and subsequent sales of suspension assemblies at supracompetitive prices, Seagate has been injured in its business and property in that it paid more for suspension assemblies than it otherwise would have paid in the absence of Defendants' unlawful conduct.  The excess payments made by Seagate to Defendants constitute property in which Seagate had a past ownership interest.

**I.    Defendants' Misuse of Seagate's Confidential Information**

175.    The Defendants' business relationships with Seagate throughout the Conspiracy Period were governed by two types of contracts:  nondisclosure agreements and product supply agreements.  The parties contemplated disclosure by Seagate LLC and its affiliates of confidential and proprietary information as a regular and necessary part of their business relationships.  Seagate's sharing of its confidential information with Defendants, particularly for design, manufacturing, and cost requirements, was necessary for Defendants to provide suspension assemblies meeting the technical and performance requirements for Seagate's HDDs.  It was also necessary for Seagate to share confidential information to negotiate the best pricing and supply terms from Defendants.  The parties also negotiated product supply agreements; these negotiations occurred under the terms of the nondisclosure agreements.  The product supply agreements governed the terms and conditions of Defendants' sales to Seagate, such as product specifications, pricing, shipping and delivery,

-36-

product warranties, and forecasts and capacity planning.  Defendants were not to disclose Seagate's confidential information to unauthorized recipients, nor use the information to conspire against Seagate.

**i.     Nondisclosure Agreements**

176.     Seagate LLC[30] and each Defendant (either itself or through its parent company) signed or was otherwise bound by an evergreen Master Nondisclosure Agreement ("Master NDA") confirming the main terms of the confidential relationship between the parties.  The parties then entered periodic Supplements for Disclosure describing categories of confidential information the parties proposed to disclose over a certain period (collectively with the Master NDAs, "NDAs"). These NDAs applied to the negotiations of all of Seagate's purchases of suspension assemblies, from all Defendants, at issue in this complaint and all work performed by Defendants to provide those products to Seagate.

177.     Defendants breached their respective NDAs with Seagate by exchanging Seagate confidential information protected by those NDAs.

178.     Defendants' breach of their respective NDAs with Seagate caused injury to Seagate in the form of higher prices and other unfavorable supply terms.

179.     Each Master NDA contained California choice-of-law and venue provisions and was executed by a Seagate entity located in California.  The NDAs are summarized below.

180.     **TDK Corp.**  Seagate LLC and Seagate Technology International and Defendant TDK Corp. entered into a Master Nondisclosure Agreement in January 2004.  This Master NDA was in effect throughout the Conspiracy Period from January 2004 through at least April 2016.

181.     The Master NDA between TDK Corp. and Seagate stated that, "[i]n order to protect certain confidential and proprietary information ('Confidential Information')," the terms "shall apply when one of us or its [sic] affiliates discloses Confidential Information to the other or its affiliates under this Agreement."  (definition parentheticals omitted).

---

[30] Seagate International was also a signatory to the Master Nondisclosure Agreement with TDK Corp.

-37-

182.    The Master NDA went on to specify that disclosed confidential information "may only be used by the Parties hereto, subject to the restrictions herein and as required for assessing or carrying out any business transactions between the Parties."  Further, the recipient of confidential information "shall protect [it] against unauthorized disclosure using the same degree of care, but no less than reasonable care, as Recipient uses to protect its own similar information."

183.    Given that the agreement also was binding on affiliates that provided or received confidential information, the Master NDA allowed that confidential information "may be disclosed to employees, affiliates or consultants of Recipient who have at least an equivalent confidentiality obligation to Recipient" and only if they "have a need to know such Confidential Information."

184.    TDK Corp. and Seagate entered more than a dozen Supplements for Disclosure during the Conspiracy Period.  Some of these Supplements specifically included HTI and SAE Magnetics as contracting parties, and others broadly defined an affiliate as an entity that TDK Corp. indirectly or directly owned or controlled, based on more than 50% equity ownership.  Some also expressly included the language that TDK Corp. and its affiliates "will not use the Seagate Confidential Information disclosed under this Supplement for the benefit of a third party."  The confidentiality restrictions applied to TDK Corp. and its affiliates.

185.    **SAE Magnetics**.  Seagate LLC and Defendant SAE Magnetics entered into a Master Nondisclosure Agreement in February 2005.  This Master NDA was in effect throughout the Conspiracy Period from February 2005 through at least April 2016.

186.    The Master NDA between SAE Magnetics and Seagate stated that, "[i]n order to protect certain confidential and proprietary information ('Confidential Information')," the terms "shall apply when one of us or its [sic] affiliates discloses Confidential Information to the other or its affiliates under this Agreement."  (definition parentheticals omitted).

187.    The Master NDA went on to specify that the disclosed confidential information "may only be used by Recipient for . . . evaluation and testing."  Further, the recipient of confidential information "shall protect [it] against unauthorized disclosure using the same degree of care, but no less than reasonable care, as Recipient uses to protect its own similar information."

188.   Given that the agreement also was binding on affiliates that provided or received confidential information, the Master NDA allowed that confidential information "may be disclosed to employees, affiliates or consultants of Recipient who have at least an equivalent confidentiality obligation to Recipient" and only if they "have a need to know such Confidential Information."

189.   SAE Magnetics and Seagate entered at least four Supplements for Disclosure during the Conspiracy Period, in addition to the Supplements with TDK Corp. that also named SAE Magnetics.   Supplements covering information disclosed between October 2011 and May 2014 changed the Master NDA provision on the right to use confidential information, which originally allowed SAE Magnetics to use Seagate's confidential information only for "evaluation and testing." This provision was replaced with the following:   "Confidential Information disclosed by Seagate may only be used by the Company, for the benefit of Seagate."   At least three Supplements broadly defined an affiliate as an entity that SAE Magnetics indirectly or directly owned or controlled, based on more than 50% equity ownership.

190.   **MPT**.   Seagate LLC and Defendant MPT entered into a Master Nondisclosure Agreement in March 2004.   This Master NDA was in effect throughout the Conspiracy Period from March 2004 through at least April 2016.   MPT and Seagate entered into at least two Supplements for Disclosure during the Conspiracy Period.

191.   The Master NDA between MPT and Seagate stated that, "[i]n order to protect certain confidential and proprietary information ('Confidential Information')," the terms "shall apply when one of us or its [sic] affiliates discloses Confidential Information to the other or its affiliates under this Agreement." (definition parentheticals omitted).   Further, "Confidential Information Disclosed by Seagate may only be used by the Company [defined as MPT and its wholly owned subsidiaries] for the benefit of Seagate."   The recipient of confidential information "shall protect [it] against unauthorized disclosure using the same degree of care, but no less than reasonable care, as Recipient uses to protect its own similar information."

192.   Given that the agreement also was binding on affiliates that provided or received confidential information, the Master NDA allowed that confidential information "may be disclosed

-39-

to employees, affiliates or consultants of Recipient who have at least an equivalent confidentiality obligation to Recipient" and only if they "have a need to know such Confidential Information."

193.   **HTI**.   Seagate LLC and Defendant HTI entered into a Master Nondisclosure Agreement in March 2003.  This Master NDA was in effect throughout the Conspiracy Period from March 2003 through at least April 2016.

194.   The Master NDA between HTI and Seagate stated that, "[i]n order to protect certain confidential and proprietary information ('Confidential Information')," the terms "shall apply when one of us discloses Confidential Information to the other under this Agreement."   (definition parentheticals omitted).

195.   The Master NDA went on to specify that "Confidential Information disclosed may only be used by the Company [HTI] for the benefit of Seagate."   The recipient of confidential information "shall protect [it] against unauthorized disclosure using the same degree of care, but no less than reasonable care, as Recipient uses to protect its own similar information."

196.   Given that the agreement also was binding on affiliates that provided or received confidential information, the Master NDA allowed that confidential information "may be disclosed to employees, affiliates or consultants of Recipient who have at least an equivalent confidentiality obligation to Recipient" and only if they "have a need to know such Confidential Information."

197.   HTI and Seagate entered at least six Supplements for Disclosure during the Conspiracy Period.  At least three Supplements specified that:  "HTI will use Seagate Information for the internal benefit of HTI or Seagate only; Seagate and its affiliates may use HTI Confidential Information for the benefit of Seagate.  HTI will not use Seagate Confidential Information in its design efforts for other customers."  At least three Supplements broadly defined an affiliate as an entity that HTI indirectly or directly owned or controlled, based on more than 50% equity ownership.

198.   **NHK Spring**.   Seagate LLC and Defendant NHK Spring entered into a Master Nondisclosure Agreement in November 2003, and this NDA was in effect throughout the Conspiracy Period from November 2003 through at least April 2016.

199.    The Master NDA between NHK Spring and Seagate stated that, "[i]n order to protect certain confidential and proprietary information ('Confidential Information')," the terms "shall apply when one of us discloses Confidential Information to the other under this Agreement." (definition parentheticals omitted).

200.    The Master NDA went on to specify that "Confidential Information disclosed may only be used by the Company [NHK Spring] for the benefit of Seagate."  The recipient of confidential information "shall protect [it] against unauthorized disclosure using the same degree of care, but no less than reasonable care, as Recipient uses to protect its own similar information." Since the agreement also was binding on affiliates that provided or received confidential information, the Master NDA allowed that confidential information "may be disclosed to employees, affiliates or consultants of Recipient who have at least an equivalent confidentiality obligation to Recipient" and only if they "have a need to know such Confidential Information."

201.    NHK Spring and Seagate entered into at least four Supplements for Disclosure during the Conspiracy Period.  At least two Supplements broadly defined an affiliate as an entity that NHK Spring indirectly or directly owned or controlled, based on more than 50% equity ownership.

202.    Seagate LLC fully performed all of its duties and obligations under, and complied with, the terms of the NDAs during and throughout the Conspiracy Period.

203.    The agreements were intended to protect all of the Seagate entities from the unauthorized use of their confidential and proprietary business information.  That is, the parties entered into the NDAs with the intent to confer a direct benefit upon Seagate LLC as well as its corporate affiliates.  Because the signatory Defendants also did business with Seagate through affiliates, including the other named Defendants, all Defendants were likewise included in the scope of the NDAs and intended to be bound by them.

204.    The prices Seagate paid to Defendants for suspension assemblies and other supply terms were set through RFQs and negotiations between Seagate and the individual Defendant, or its parent company.  The Defendants manipulated these negotiations to obtain higher prices and other favorable supply terms from Seagate and avoid a "price war" between each other, by using

-41-

confidential Seagate information they had received from other Defendants.   Defendants used confidential Seagate information received from other Defendants to inform and decide what prices and other supply terms to offer Seagate.

205.   Defendants used confidential information disclosed under the NDAs to advantage themselves at Seagate's expense.   This confidential Seagate information included, for example, Seagate's demand volumes (total available market, or "TAM"), preferred allocation of TAM among suppliers, price targets, actual pricing in current and prior projects, actual volumes used in current and prior projects, and technical requirements for upcoming programs.   This Seagate confidential information was often intended to be disclosed to only one of the Defendant suppliers, and Seagate disclosed it to that specific Defendant with the expectation and understanding that the Defendant would not share it with other Defendants, as required by the NDAs with that specific Defendant.

206.   As illustrative but not exhaustive examples:

a.   In March 2010, MPT received confidential pricing information from NHK about the price Seagate paid NHK last quarter and NHK's pricing offer to Seagate for next quarter.   NHK shared this information in violation of the Supplement for Disclosure between Seagate and NHK which protected Seagate's and NHK's pricing information disclosed during this period.   This confidential information informed MPT's decision on pricing terms to offer Seagate, and MPT used the confidential information to offer higher prices than it otherwise would have but for NHK's disclosure of the information.

b.   In January 2011, NHK provided information to MPT on NHK's price quote for Seagate's proposed TAM allocation, production volumes for current Seagate programs, and new capacity for upcoming Seagate programs, in violation of the Supplement for Disclosure between Seagate and NHK (protecting, *inter alia*, business and technical information related to the design and manufacture of disk drives and disk drive components, manufacturing processes, volume, and pricing).   This confidential information informed MPT's decision on what supply

-42-

terms to offer (or not offer) Seagate, depriving Seagate of more favorable terms it may otherwise have received but for NHK providing the confidential information to MPT.

c.  In May 2012, an NHK employee reported internally on information learned from MPT.  MPT shared confidential Seagate information related to monthly capacity for two Seagate projects, volumes pulled from inventory by Seagate, and total project volumes.  The information shared by MPT was Seagate's confidential business and technical information protected by a Supplement between Seagate and MPT.  This confidential information informed NHK's decision on what supply terms to offer (or not offer) Seagate.

d.  In October 2012, NHK provided to MPT Seagate's volume forecasts and allocation for NHK for several quarters.  NHK also shared its pricing for a specific program and the pricing Seagate claimed it received from MPT.  MPT denied that its pricing was as low as Seagate said, meaning NHK could bid higher without fear of losing (if it believed MPT).  These exchanges were in breach of Supplements between Seagate and each of MPT and NHK in effect at the time and protecting Seagate's manufacturing, volume, and pricing information.

e.  In March 2013, SAE Magnetics provided NHK with Seagate's forecasts for HGAs, as well as information on Seagate's current HGA, actuator pivot flex assembly ("APFA"), head stack assembly ("HSA"), and HDD operations.  NHK discussed this information internally and considered how to use it in upcoming discussions with Seagate, including to get a higher profit margin or larger volume of business.  SAE Magnetics breached the provisions of its Supplement with Seagate covering this time period and Seagate's "pricing, volumes, trends and forecasts."

f.  In January 2014, NHK and MPT met to compare the RFQs they received from Seagate and discuss pricing and TAM allocations to prepare for upcoming

-43-

meetings with Seagate.  In a report on the meeting, an NHK employee noted that MPT confirmed its pricing and HTI's pricing, which had also been confirmed by SAE.  NHK therefore had the benefit of pricing information from three other entities, and knowledge of the contents of MPT's RFQ from Seagate, to inform its RFQ response.  In coordinating their pricing, NHK and MPT did not have to submit competitive bids to win Seagate's business but rather could charge supracompetitive prices.  NHK, SAE Magnetics, and MPT's parent company TDK Corp. each had a Supplement in effect at the time of these mutual disclosures, and the disclosed business information was protected by the Supplements.

g.   In June 2014, NHK and MPT discussed Seagate's RFQ for a program, including the utilization and yield needed and bill of materials cost.  The companies planned to use the shared Seagate information to coordinate their RFQ responses and "figure out how much of a premium there will be" for the project.  That is, by sharing Seagate's confidential information with each other, the two suppliers could engineer a pricing premium and inflated profit margin.  NHK and MPT's parent company both had Supplements covering these disclosures during this time period, putting both parties in breach of their respective agreements.

207.   That Defendants were willing to and did share otherwise confidential information is evident from the results of the government investigations.  DOJ found that the conspirators improperly exchanged confidential information, as reflected in NHK's plea agreement, which states that the companies "exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes" in order to "effectuate" their conspiratorial agreements and charge higher prices.[31]  NHK and TDK "used the exchanged pricing information *to inform their negotiations* with U.S. and foreign customers that purchased HDD suspension assemblies," including Seagate.[32]

---

[31] Plea Agreement ¶ 4(c).
[32] *Id.* (emphasis added).

-44-

208.    As discussed above, CADE found that Defendants exchanged confidential information to soften or eliminate price competition in private bidding processes and to coordinate the division of the suspension assemblies market.   The commercially sensitive information exchanged to charge Seagate higher prices included Seagate's confidential information protected from disclosure by its NDAs with the Defendants.

209.    Likewise, the JFTC found that TDK and NHK exchanged demand forecasts and quoted pricing for RFQs to implement the conspiratorial agreement to fix prices and allocate markets.  Seagate's NDAs with Defendants encompass these types of information.

210.    The Defendants exchanged Seagate's confidential information for their own benefit, to unjustly enrich themselves, at Seagate's expense.

211.    As a direct and proximate result of the Defendants' unlawful and inequitable conduct, Seagate was damaged (and Defendants were unjustly enriched).  Defendants charged and Seagate paid supracompetitive prices for suspension assemblies, proximately caused by Defendants' breaches of their NDAs with Seagate, throughout the Conspiracy Period.

212.    Defendants used confidential Seagate business information—including pricing, volumes, product roadmaps and technology timelines, trends and forecasts, development plans, sub-supplier information, financial information, materials, and manufacturing volumes—in furtherance of their conspiracy and in order to allocate market shares, raise prices, rig bids, and disadvantage Seagate in negotiations.

213.    Defendants' breaches of the NDAs allowed them to charge Seagate higher prices than would have prevailed if the Defendants were actively competing to supply Seagate.  The Defendants undermined Seagate's ability to negotiate lower prices through the competitive bidding process.  Defendants had no reason to lower prices to increase (or at least maintain) their share of TAM when they knew Seagate's target TAM allocations and pricing for other suppliers.  By using Seagate confidential information to coordinate bids and volumes, the Defendants could avoid a "bloody price war for allocation" rather than submit competitive bids and try to undercut the prices of their competitors.  The Defendants illegally profited at Seagate's expense.

214.     More specifically as related to Seagate's confidential prices, when one Defendant learned what price Seagate demanded (in confidence) from another Defendant or discussed (in confidence) with another Defendant, the Defendant receiving that confidential price would use it to decide what price to offer Seagate.  Importantly, the Defendant receiving that confidential price would use it to set its own price at levels not too far below that price (or at times at or above that price).  Seagate would then lose the benefit of the difference between the price offered and the lower price it would have been offered, if not for the breach.  The exchanges of Seagate's confidential information allowed the Defendants to align their pricing rather than offer competitive pricing.  The Defendants offered higher pricing to Seagate than they would have absent the breach of the NDAs.

215.     For example, in one August 2005 email, MPT referenced contacting HTI to see if it was getting the same demands from Seagate regarding Seagate's Alpine project.  By learning Seagate's *confidential* demands to HTI, MPT had more certainty on what to offer to Seagate, and furthermore, MPT had more certainty that it did not need to offer anything *more competitive* (i.e., more favorable to Seagate) than what Seagate demanded *confidentially* from HTI.  Seagate suffered injury in the difference between what MPT offered to Seagate and what MPT would have offered to Seagate but for the breach.

216.     Seagate used the common negotiation tactic of playing the suppliers off of each other to obtain a lower price or other favorable term.  Defendants illegally subverted this strategy by sharing confidential information Seagate provided during negotiations, pursuant to the NDAs, and their planned responses to Seagate.  The breach of the NDAs allowed Defendants to continue to offer higher prices during negotiations than they otherwise would have offered.  As a result, Seagate paid higher prices for suspension assemblies than it would have if not for the breach.

217.     By sharing Seagate's confidential product roadmaps, development timing, and forecasts, the Defendants could conduct long-term planning for their conspiracy.  By knowing what projects were on the horizon and which suppliers were invited to bid, they could ensure the conspirators all benefited over the course of several Seagate projects.  Additionally, as with pricing, they could coordinate their utilization and costs across projects to inflate the material cost provided

-46-

to Seagate and support a higher price.  With the suppliers aligned and Seagate in the dark about the suppliers' conspiratorial planning, Seagate was more likely to accept the higher price, allowing the Defendants to artificially increase their product margins at Seagate's expense.

### ii.    Product Supply Agreements

218.    Seagate LLC and each Defendant (either itself or through its parent company) also entered product supply agreements ("PSAs").  The PSAs provided negotiated pricing and other terms and conditions under which the Defendants provided products to Seagate.  All the PSAs included provisions on confidentiality that governed disclosures of confidential and proprietary information between the parties.  All the PSAs also included a "compliance with all laws" provision, requiring the supplier, all products it supplied, and all work it performed to "comply with all applicable laws and regulations in effect."

### J.    Trade and Commerce Affected by the Conspiracy

219.    The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate and foreign trade and commerce of, the United States.

220.    During the Conspiracy Period, Defendants collectively controlled approximately 90% of the global supply of suspension assemblies.  The conspiracy alleged herein thus affected billions of dollars of commerce.

221.    Defendants' sales in the United States and sales outside the United States of suspension assemblies destined for the United States account for a significant portion of these sizable revenues.  U.S.-destined suspension assemblies were a major focus of the conspiracy.

222.    Each Defendant HTI, NHK, and TDK—itself and/or by or through one or more of its subsidiaries—sold suspension assemblies in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district and through and into Minnesota.  Each further sold suspension assemblies in the United States for delivery to the United States and outside the United States for incorporation into HDDs destined for sale worldwide, including the United States and including Minnesota, at collusive and

-47-

supracompetitive prices.  Defendants were fully aware that these suspension assemblies would be in products destined for customers in California, Minnesota, and elsewhere in the United States.

223.    All three Defendants—HTI, NHK, and TDK—also primarily negotiated sales of suspension assemblies via in-person meetings in the United States, including in Minnesota and California, telephone and video conferences in the United States, including in Minnesota and California, and email communications sent from the United States, including in Minnesota and California.

224.    For these and other reasons, Defendants therefore knowingly and intentionally sent price-fixed suspension assemblies into the stream of commerce of the United States, including the commerce of Minnesota and California.  Such conduct was meant to produce and did in fact produce a direct, substantial, and reasonably foreseeable harmful effect on domestic and import commerce in the United States in the form of artificially high prices being paid for suspension assemblies by U.S. customers, including Seagate.  Defendants engaged in illegal conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable anticompetitive effects on domestic and import commerce in the United States.

225.    Defendants' unlawful activities with respect to Seagate's purchases of suspension assemblies had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States domestic and import commerce, including commerce in this judicial district and in Minnesota and California, that gives rise to the claims asserted herein.

226.    The unlawful conduct described herein, and its anticompetitive effect on U.S. domestic and import commerce, caused antitrust injury to Seagate in the United States, including in Minnesota and California, in the form of supracompetitive prices for suspension assemblies, which were the natural, foreseeable, and intended consequence of Defendants' anticompetitive conduct.  It also caused antitrust injury to Seagate arising directly from the unlawful conduct's impact on U.S. import trade and commerce in the form of supracompetitive prices for suspension assemblies purchased for incorporation into HDD products to be sold in the United States.

227.    During the Conspiracy Period, suspension assembly prices were higher and decreased less than they would have under competitive market conditions, were stabilized, and in some instances, increased.  As a result, Seagate paid overcharges totaling hundreds of millions of dollars for billions of suspension assemblies purchased throughout the Conspiracy Period.

228.    It will be possible to measure and quantify the overcharges that Seagate paid using economic analyses.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge.  Thus, the economic harm to Seagate can and will be quantified.

229.    Much of the relevant information is in the possession and control of Defendants and not Seagate, so the full nature and extent of the conspiracy's anticompetitive effects are unknown to Seagate at this time.

## VI.    CONTINUING VIOLATION, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

230.    This Complaint alleges a continuing course of conduct (including conduct within the applicable limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm, including within the applicable statutes of limitations.

231.    Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Seagate.

232.    Each time Seagate purchased affected suspension assemblies, Seagate suffered a separate and independent injury flowing from Defendants' anticompetitive conduct.

233.    Because Defendants have engaged in a continuing course of conduct, Seagate's claims are timely.

234.    During the Conspiracy Period, Seagate had neither actual nor constructive knowledge of the pertinent facts upon which its claims are predicated, despite diligence in trying to discover such facts.

235.    The doctrine of fraudulent concealment therefore tolls the statute of limitations on the claims asserted herein by Seagate.  Seagate did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until much later after

-49-

the Conspiracy Period because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

236.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

237.    In particular, when Seagate needed to contract for suspension assemblies, it requested bids from representatives of each Defendant.  Those representatives represented that they were bidding in a serious attempt to secure the business and that their pricing reflected normal market factors like costs, demand for their products, capacity, and other lawful factors.

238.    Those representations were false because they failed to disclose that Defendants had agreed with one another not to engage in a "price war," exchanged information about their bids, agreed to allocate market volumes, and priced based on their conspiracy and the price-fixing agreements that they reached.  As such, the statements made by Defendants during bidding processes for Seagate's business constituted affirmative acts of concealment of their conduct by making false representations about each Defendant's desire to provide a competitive bid and justifications for its proposed prices.

239.    Seagate's reliance on those representations was reasonable because competing suppliers typically submit bids that reflect an effort to secure the potential business and do not unlawfully coordinate on price, customer volumes, and bidding.  Given these representations, Seagate was reasonably diligent in discovering the facts underlying its claims.  It had no reason to suspect anticompetitive agreements—including that that Defendants had agreed not to engage in price competition with one another—until the various government investigations brought those agreements to light.

240.    Moreover, by its very nature, the conspiracy was inherently self-concealing. Suspension assemblies are not exempt from antitrust regulation and, thus, Seagate reasonably considered the suspension assembly industry to be a competitive industry.  Seagate also reasonably understood that Defendants were in compliance with their contractual agreements, including the requirement in each PSA to comply with all applicable laws.

-50-

241. Because the conspiracy was self-concealing and affirmatively concealed by Defendants and their co-conspirators, Seagate had no knowledge of the conspiracy, or of facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed. It could not have been aware of the conduct until, at the earliest, the public announcement of the JFTC investigation in July 2016.

242. For these reasons, the statute of limitations applicable to Seagate's claims was tolled and did not begin to run until at least July 2016.

243. Additionally, Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), suspended the running of the statute of limitations on Seagate's federal claim as of July 29, 2019, the date on which the DOJ filed a criminal action against NHK. The action against NHK is a "criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of" the Sherman Act. Seagate's case is "based in whole or in part on [the] matter complained of" in the criminal action, and the criminal action terminated on December 23, 2019, less than one year prior to the filing of this Complaint.

**VII.   SEAGATE'S INJURIES**

244. By reason of the violations of the antitrust law and breaches of Seagate's NDAs alleged herein, Seagate has sustained injury to its business or property, having paid higher prices for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct, and, as a result, has suffered damages in an amount presently undetermined. This is, *inter alia*, an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

245. As a purchaser of suspension assemblies, Seagate suffered direct, substantial, and reasonably foreseeable injuries as a result of the conspiracy.

246. Seagate purchased suspension assemblies directly from certain Defendants at prices that were artificially inflated as a result of the conspiracy.

247. Throughout the Conspiracy Period, Defendants controlled the supply of HDD suspension assemblies, forcing Seagate to purchase suspension assemblies at artificially inflated prices.

248.     Overcharges due to price-fixing agreements and other anticompetitive collusion are among the injuries the Sherman Act is intended to prevent, and flow from the competitive harms that make such collusion unlawful.  Accordingly, Seagate suffered antitrust injury, among other harm, in connection with its purchases of suspension assemblies during the Conspiracy Period, in an amount equal to the total of the overcharges it paid, to be determined at trial.

249.     Seagate likewise suffered injury to its business or property from the Defendants' misuse of Seagate confidential information in violation of their NDAs with Seagate.  Defendants exchanged Seagate confidential information, which they were allowed to share only with corporate affiliates and use only for the benefit of Seagate in providing suspension assembly products, to charge Seagate higher prices than they would have charged without the benefit of Seagate confidential information provided by other Defendants.

250.     That is, Seagate paid higher prices to Defendants for suspension assemblies as a direct and proximate result of Defendants' sharing of Seagate's confidential information with unauthorized recipients.  Defendants' specific purpose for breaching the NDAs was to charge Seagate these higher prices.  At the time of entering the NDAs, Defendants could reasonably foresee that breaching the NDAs in this manner would result in higher prices to Seagate.  The excess payments made by Seagate to Defendants constitute property in which Seagate had a past ownership interest.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Restraint of Trade in Violation of the Sherman Act § 1, 15 U.S.C. § 1 (Alleged against All Defendants)

251.     Seagate incorporates by reference the allegations in the preceding paragraphs.

252.     Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing

-52-

and supply of suspension assemblies, which had direct, substantial, and reasonably foreseeable effects on United States domestic and import commerce giving rise to Seagate's claims.

253.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to United States purchasers during the Conspiracy Period.

254.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

255.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in the United States and elsewhere.

256.    The anticompetitive acts were intentionally directed at the United States market for suspension assemblies and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for suspension assemblies throughout the United States.

257.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a.  Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b.  Allocating customers and market shares among themselves;

    c.  Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

e.  Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

f.  Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

258.  As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

259.  The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## COUNT II

### Restraint of Trade in Violation of the Cartwright Act,
### Cal. Bus. & Prof. Code §§ 16720 et seq.  (Alleged against All Defendants)

260.  Seagate incorporates by reference the allegations in the preceding paragraphs.

261.  Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

262.  In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold for incorporation into HDDs purchased in California during the Conspiracy Period.

263.  The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

-54-

officers, agents, employees, or representatives while actively engaged in the management of their affairs.

264.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

265.    The anticompetitive acts were intentionally directed at the California market for HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

266.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a.  Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b.  Allocating customers and market shares among themselves;

    c.  Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

    e.  Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

    f.  Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

267.    As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

268.    The alleged contract, combination, or conspiracy is a per se violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq.

## COUNT III

### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200 et seq. (Alleged against All Defendants)

269.    Seagate incorporates by reference the allegations in the preceding paragraphs.

270.    Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

271.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to purchasers in California during the Conspiracy Period.

272.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

273.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among

Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

274.   The anticompetitive acts were intentionally directed at the California market for suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

275.   For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

a.   Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

b.   Allocating customers and market shares among themselves;

c.   Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

d.   Exchanging competitively sensitive information, including anticipated pricing quotes;

e.   Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

f.   Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

276.   As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

277.     The alleged contract, combination, or conspiracy is an unlawful, fraudulent, and/or unfair act or practice constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq.

## COUNT IV

### Restraint of Trade in Violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66 (Alleged against All Defendants)

278.     Seagate incorporates by reference the allegations in the preceding paragraphs.

279.     Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66, by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in Minnesota and elsewhere.

280.     In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to purchasers, including Seagate, in Minnesota and outside of Minnesota for hard disk drives delivered to Minnesota during the Conspiracy Period.

281.     The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

282.     The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in Minnesota and elsewhere.

283.     The anticompetitive acts were intentionally carried out in Minnesota, directed at suspension assemblies supplied in Minnesota, and had a substantial and foreseeable effect on trade

and commerce in Minnesota by raising and fixing prices for suspension assemblies throughout Minnesota and elsewhere.

284.   The alleged contract, combination, or conspiracy is a per se violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66.

## COUNT V

**Breach of Contract – Nondisclosure Agreements (Against All Defendants except Headway)**

285.   Seagate incorporates by reference the allegations in the preceding paragraphs.

286.   Defendants executed Master Nondisclosure Agreements with Seagate LLC, including Supplements thereto, during the Conspiracy Period which were valid and binding contracts.

287.   The parties contemplated disclosure of confidential business and technical information by Seagate LLC as well as its corporate affiliates as a necessary part of purchasing suspension assemblies from the Defendants.  Without providing design specifications, volume forecasts, capacity, product roadmaps, and pricing information, Seagate would not be able to ensure a steady supply of components for its current and future products.  Accordingly, Seagate and Defendants entered NDAs to protect these disclosures of proprietary and competitively sensitive information and to confer a direct benefit upon Seagate LLC as well as its corporate affiliates.

288.   Seagate provided Defendants with confidential business information pursuant to these NDAs as intended.

289.   Seagate LLC, and its affiliates, have fully performed all of their duties and obligations under the NDAs.

290.   Pursuant to the NDAs, Defendants were required to, among other things, use Seagate's confidential business information only as specified and protect Seagate's confidential business information from unauthorized disclosure.

291.   Defendants were not to use Seagate's confidential information to conspire with one another against Seagate or to illegally raise prices to Seagate or allocate supply shares among themselves.

292.   Defendants breached these obligations by misusing, exchanging, and/or disclosing Seagate's confidential business information, as set forth herein.  Throughout the Conspiracy Period, NHK, TDK, and HTI each shared information that Seagate had provided it under the NDAs with each of the other Defendant families, in violation of their NDAs with Seagate.

293.   The Defendants used the Seagate confidential information to avoid underbidding each other, keep sales prices above the competitive level that otherwise would have obtained, and maintain and implement their market share allocation.

294.   All Defendants breached their NDAs with Seagate by exchanging Seagate confidential information protected by those NDAs, and the breach caused injury to Seagate.  As a direct and proximate result of Defendants' breach of the NDAs, Seagate has suffered actual damages in the form of unlawfully inflated prices for suspension assemblies, and Defendants have been unjustly enriched at Seagate's expense.  Seagate paid more than it otherwise would have paid in the absence of the Defendants' improper use of Seagate's confidential information protected by the NDAs.

## IX.   DEMAND FOR JUDGMENT

WHEREFORE, Seagate demands judgment in Seagate's favor and against all Defendants adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the state laws enumerated in this Complaint;

B.   Defendants' unlawful contract, combination, and conspiracy is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the state laws enumerated in this Complaint;

C.   Defendants (except Headway) breached their contractual obligations under their NDAs with Seagate;

D.   Seagate's business and property were injured as a result of Defendants' violations and breaches;

E.   Seagate shall recover damages sustained by it as provided by federal and state laws, and a joint and several judgment in favor of Seagate shall be entered against the Defendants in an

-60-

amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act (15 U.S.C. § 15(a));

F.      Seagate shall be entitled to all appropriate equitable relief, including restitution, unjust enrichment, and/or disgorgement of Defendants' revenues, earnings, profits, compensation, benefits and/or ill-gotten gains from their violations of federal and state laws;

G.      To the fullest extent permitted by law, Seagate shall be awarded pre-judgment and post-judgment interest on the damages it suffered, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.      Seagate shall recover its costs and fees incurred in this suit, including reasonable attorneys' fees as provided by applicable law; and

I.      Seagate shall receive such other or further relief as may be just and proper.

## X.      JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Seagate demands a trial by jury of all the claims asserted in this complaint so triable.

Dated:  September 18, 2020

*/s/ Kenneth R. O'Rourke*

Kenneth R. O'Rourke
Jeff VanHooreweghe
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:  (415) 947-2000
Facsimile:  (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com

Mikaela E. Evans-Aziz (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone:  (212) 497-7710
Facsimile:  (212) 999-5899
mevansaziz@wsgr.com

***Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International***

-62-